In re INDEPENDENT SEWER PIPE CO.

(District Court, S. D. California, S. D.    March 4, 1918.)

No. 2173.

1. CARRIERS ⊂⊃12(1)—RATES AND CHARGES—STATUTORY REGULATIONS.
    Under Public Utility Act (St. Cal. 1915, p. 115 et seq.) § 14, requiring carriers to file schedules of rates and charges, section 15, prohibiting changes of rates, except after 30 days' notice, unless permitted by the Railroad Commission, and section 17(a), subd. 2, prohibiting the collection or receipt of a greater, less, or different compensation than that specified in the schedules, a rate, when reasonable and adopted, announced and published with the consent of the Commission, becomes fixed, certain, and exclusively applicable, and no other rate may be charged and collected for a particular commodity than that specified in the schedules.

2. CARRIERS ⊂⊃18(1)—RATES AND CHARGES—OVERCHARGES AND UNDERCHARGES.
    Under the California Public Utility Act, if a different rate be charged or collected than the one published in the carrier's schedules for that commodity, a refund may be had in the case of an excess, or a recovery of the difference in case of an undercharge.

3. CARRIERS ⊂⊃12(1)—RATES AND CHARGES—STATUTORY REGULATIONS.
    Under the California Public Utilities Act, no mistake of fact, or special practice, engagement, or understanding of the parties, can render a different rate applicable to a commodity than that specified in the carrier's schedules.

4. CARRIERS ⊂⊃196—ACTION FOR CHARGES—WEIGHT OF EVIDENCE.
    In a proceeding on a claim for unpaid freight charges, evidence *held* to show that the commodity transported was clay, and not sand, to which a different rate applied.

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. CARRIERS ☞12(1)—REGULATIONS—DETERMINATION BY RAILROAD COMMISSION—CONCLUSIVENESS.

A proceeding before a Railroad Commission, in which it refused to eliminate a rate on sand between certain points because there was material to be shipped which was incontrovertibly sand, was not conclusive as to whether material transported between those points' was sand or clay.

6. CARRIERS ☞12(1)—REGULATIONS—LEGISLATIVE AND JUDICIAL QUESTIONS.

What rate should be established for hauling a specified commodity is an administrative or legal question, properly determinable by a Railroad Commission; but what a given commodity is is a judicial question, over which the Commission has no jurisdiction.

In Bankruptcy. In the matter of the Independent Sewer Pipe Company, bankrupt. On review of an order of the referee disallowing a claim. Order annulled, and matter re-referred to the referee, with directions.

A. L. Abrahams, of Los Angeles, Cal., for trustee.

W. I. Gilbert and F. S. Sisk, both of Los Angeles, Cal., for claimants.

BLEDSOE, District Judge. Review is sought of an order of the referee disallowing in full a claim of the Southern Pacific Company against the bankrupt in the sum of $1,749.09, representing alleged unpaid freight charges upon a certain commodity transported over claimant's lines from Ione, Amador county, to Tropico, Los Angeles county, and also for the transportation of a similar commodity from Alberhill and Prado, Riverside county, to Tropico.

California has a Public Utility Act (Stats. Cal. 1915, p. 115 et seq.) modeled, at least with respect to railroad companies, after, and therefore to be construed similarly to, the federal Interstate Commerce Act. Section 14 of the act (p. 122) provides that the carrier shall file with the Railroad Commission and keep open for public inspection schedules showing the rates, fares, charges, and classifications for the transportation between termini within this state of persons and property from each point upon its route to all other points thereon, etc. Section 15, p. 124, provides that, unless otherwise permitted by the Railroad Commission, no change shall be made by any public utility in any rate, fare, charge, or classification, except after 30 days' notice, etc. Section 17a (2), p. 124, provides that:

"No common carrier shall charge, demand, collect or receive a greater or less or different compensation for the transportation of persons or property, or for any service in connection therewith, than the rates, fares and charges applicable to such transportation as specified in its schedules filed and in effect at the time; nor shall any such carrier refund or remit in any manner or by any device, any portion of the rates, fares, or charges so specified, except upon order of the Commission," etc.

The same inhibition is reiterated as to public utilities generally in section 17b, p. 127. Appropriate penalties (sections 76 and 77, p. 167), being not less than $500 nor more than $2,000 fine for each violation of the provisions of the act, as against the public utility guilty thereof, and by both fine and imprisonment against any officer, agent, or employé thereof, are provided.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In this case it appears, without question, that the commodity which was hauled from Ione to Tropico, a distance of over 500 miles, consisting of about 25 carloads, was hauled, waybilled, and paid for by the bankrupt as "sand," the rate on which under the published schedules at all times in question was $2.20 per ton. (One of claimant's briefs contains a statement, coming from one of its general officers, that the classification in the schedules was "common sand"; but I do not find this sustained by anything in the record. It would seem "important, if true," although, perhaps, the term "sand," as used in the schedules, would import "common sand.") At the same times the rate on "crude clay (except china clay or kaolin)" was $3 per ton. The commodity shipped from Alberhill and Prado to Tropico, amounting to 13 carloads, was waybilled as "clay," although, as hereinafter referred to, it also seems to have been considered by the referee as having been shipped as "sand."

The question in the case is whether the substance actually transported by claimant was sand or clay. If sand, at least with respect to the Ione shipments, the carriage charges have been fully paid. If clay, under the law as repeatedly determined, the carriage charges with respect to such shipments having been paid only in part, it is not only claimant's right, but its duty, to present its claim, and, if possible, effect a recovery as for the balance due. Loath as I am to disagree with a referee upon a question of fact presented upon review, I am constrained to believe that in this case the referee has arrived at erroneous conclusions with respect both to the fact and the law involved, and that in consequence his order should be annulled. The referee in his certificate, inter alia, says:

"It also appears from uncontradicted evidence adduced that the commodity, the character and proper classification of which is at issue here, had been shipped over claimant's lines for a number of years prior to the shipments in question, and had been received by the claimant for shipment, under the classification of sand and at the sand rate. The commodity is, and at all times has been, used commercially as what is called a grog or filler in the making of clay products, and is commonly and usually designated as what is known as 'Ione sand.'"

He then refers to the testimony of an expert geologist, offered by claimant, and, after admitting some inability thoroughly to understand just exactly what the expert intended to testify to—an inability which is shared by the court after reading his testimony carefully—the referee proceeds to quote the definitions of clay and sand as given in Webster's Dictionary, and then says:

"An examination and inspection of the samples offered in evidence brings the substance within the definition of sand, rather than within the definition of clay. Taking all the evidence into consideration, the referee finds that this substance, viz. the commodity involved in this controversy, is geologically as well as commercially to be classified as sand."

Some attention is then paid by the referee to a suggestion that had been made that the Railroad Commission had never classified this commodity either as clay or sand, and that in a proceeding had before the Commission, intended, as it is said, to effectuate that purpose, no action was taken. The referee then proceeds:

"The referee finds that it was at the time of the shipments in question, and for a long time prior thereto had been, the practice of the claimant to carry the commodity in question at the sand rate, and that the claimant has not obtained from the Railroad Commission of the state of California permission to change the classification, so as to increase the rate on the commodity in question; nor has the claimant obtained permission to change its practice of carrying this commodity at the sand rate. The referee finds that the Railroad Commission of the state of California has made no findings or order permitting the claimant to change its said practice or classification, nor has said Commission made any findings that the increase in the rate is justified."

[1-3] The statement last expressed by the referee leads the court to indulge in the inference that it was the opinion of the referee that, since the Railroad Commission had not authorized an increase in the rate affecting the particular commodity hauled by claimant, in consequence, claimant's claim for unpaid transportation charges should be denied. My understanding of the situation, however, is that a rate becomes fixed, certain, and exclusively applicable because of the fact that, being reasonable, it is adopted, announced, and published with the consent of the Railroad Commission as the rate to be charged; that for the particular commodity which may be specified in the rate, and between the termini stated, no other rate for the carriage of that commodity may be charged or collected; and that, if a different rate than the one published in the schedules for that commodity be charged or collected, as for an excess a refund may be had, and as for an undercharge suit may be brought for the recovery of the difference. This is upon the principle that definite rates for definite commodities between definite points are to be established, subject to such governmental regulation as may be provided, and that, when so established and until lawfully changed, they may not be departed from, in order that equality and justice and no discrimination may be had as among shippers. All shippers, as well as the carrier, are required to live up to and in completest fashion abide by the rates thus announced and adopted; for an infraction of these requirements appropriate penalties are provided, and indubitable authority exists on the civil side of the courts to effect such a readjustment as will make the charges fixed and the charges paid, or to be paid, accord. Louisville & Nashville Rd. Co. v. Maxwell, 237 U. S. 94, p. 97, 35 Sup. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665; Central of Georgia Rd. v. Curtis, 14 Ga. App. 716, 82 S. E. 318; Ill. Cent. Ry. Co. v. Separi (D. C.) 205 Fed. 998; South. Ry. Co. v. Harrison, 119 Ala. 539, 24 South. 552, 43 L. R. A. 385, 72 Am. St. Rep. 936; Pecos Valley Ry. Co. v. Harris, 14 N. M. 410, 94 Pac. 951; Davis v. Sou. Pac. Co. (D. C.) 235 Fed. 731, in which case this court had occasion to consider the general subject-matter here involved and announced conclusions which seem to be fortified by authorities apposite herein. No mistake of fact, or special practice, engagement, or understanding of the parties, will suffice to change the general rule hereinabove announced. The only question open to debate is: What is the particular rate established for the commodity actually hauled, and has it been paid? Texas & Pacific Ry. v. Mugg, 202 U. S. 242, p. 245, 26 Sup. Ct. 628, 50 L. Ed. 1011.

So, the question in the case, irrespective of what the parties may have thought, done, or said in the matter of transporting this com-

modity, is: What was the commodity? Was it "crude clay (except china clay or kaolin)," or was it "sand"? This is a fact, to be determined as any other fact in litigation, but in which the conduct or admission of the parties is to have no weight. The public are interested in seeing, as they are determined, that specified commodities shall pay the specified charges; nothing more, nothing less.

[4] The conclusions of the referee seem to be based partly upon a personal inspection of the commodity, samples of which were received by him in evidence, and which samples have been transmitted to and examined by this court, and partly upon the evidence of the experts above referred to. In so far as the evidence of the experts is concerned, in my judgment, the conclusions of the referee stand without support. In spite of the confessed inability to determine all that the expert was intending to testify to, it does appear that he stated, without qualification, that the commodity, physically considered, was made up of 22.36 per cent. of sand and 77.64 per cent. of clay. His chemical analysis of the commodity showed the following ingredients: Silica, 66.50 per cent.; iron oxide, 2.71 per cent.; alumina, 21.65 per cent.; lime, .20 per cent.; magnesia, .47 per cent.; alkalies, 1.61 per cent. It also exhibited an ignition loss—that is, dehydration—of 6.86 per cent. This analysis corresponds markedly with analyses of different clays, as shown in the Americana and New International Encyclopædias, title "Clay." Accompanying his chemical analysis in the statement transmitted by him, the expert says:

"The material of the specimen is a sandy white clay or kaolin. * * * This clay, like all other clays, is a mixture of decomposed rock materials. In this clay the substance appears to be almost entirely kaolin, the essential substance of the high-grade clays. A considerable part of the material is granular decomposed feldspar, which is clay and can be pulverized between the fingers. Some of the granules are fine quartz sand."

One of the witnesses offered by the trustee, an employé of the bankrupt at its sewer pipe factory, testified that the commodity in question was used as "grog." He also said that he had never seen a sample of the commodity tested, to see whether it was plastic or not, and he did not think that it was plastic. The eleventh edition of the Encyclopædia Britannica, sub nom. "Clay," says that clay is:

"A fine-grained, almost impalpable substance, soft, more or less coherent when dry, plastic and retentive of water when wet. * * * It consists essentially of hydrous aluminum silicate, with various impurities. * * * Sands are more coarse-grained than clays. * * * A little clay, stirred up with water in a glass, takes hours to settle, and even after two or three days some remains in suspension. * * * Their [pure clays] silica ranges from about 60 to 45 per cent., varying in accordance with the amount of quartz and feldspar present. Alumina is high in the finer clays (18 to 30 per cent.). Magnesia is never absent."

Under the title "Sand" the same authority says:

"When rocks or minerals are pulverized by any agencies, natural or artificial, the products may be classed as gravels, sands, and muds or clays, according to the size of the individual particles. If the grains are so fine as to be impalpable (about 1/1000 in. in diameter), the deposit may be regarded as mud or clay."

The Standard Dictionary defines clay as:

"A common earth of various colors, compact and brittle when dry, but plastic and tenacious when wet. * * * A hydrous aluminum silicate."

It defines sand as:

"A grain or particle of rock material large enough to be easily visible to the naked eye, but not so large as to be regarded as a stone or pebble, forming an incoherent aggregate."

The Century Dictionary says of clay:

"The material resulting from the decomposition and consequent hydration of the feldspathic rocks. * * * As thus formed it almost always contains more or less sand, or silicious material, mechanically intermixed. After this has been separated, the clay itself is found to consist of a hydrated silicate of aluminum; but it is not yet positively made out that there is one definite combination of this kind, constituting the essential basis of all the substances to which the name clay is applied. All clays contain hygroscopic water which may be expelled by heating to 212° F.; but they also contain water in chemical combination, and when this is driven off by ignition the clay loses its plasticity, which cannot be restored. Ordinary clay contains more or less lime and other impurities, which render it to a certain extent fusible. The purer varieties are refractory, and are known as fire clay. The plasticity of clay is of great importance, as without this quality it could not be easily worked into the various shapes for which it is used."

Geikie, a world-accepted authority on Geology, says of clay (volume 2, New Science Library, p. 158, J. A. Hill & Co., 1904):

"When wet, it can be kneaded between the fingers; when dry, it is soft and friable" (easily pulverized).

Dana, in his text-book on Geology, p. 34, says:

"Pure clay, or kaolin, is white and feels greasy."

I find the term "grog" defined by Webster as:

"The refractory materials, such as pulverized pottery and fire bricks, fire clay, etc., which are used in the manufacture of crucibles, fire bricks and the like."

By the Century Dictionary it is defined, and this is the only definition I find therein:

"The vitrifying ingredients usually added to the terra cotta clays are pure white sand, old pottery and fire bricks finely pulverized, and clay previously burned, termed 'grog.'    C. T. Davis, Bricks & Tiles, p. 313."

"Clay and Pottery Industries," Lippincott, 1914, p. 385, note, says:

"Grog is a technical term applied to a granular mass of fired clay which is used for tempering clays. The grog may be prepared either by firing and 'subsequently grinding raw clay, or by simply grinding fire clay goods.'"

From these authorities, as I read them, clay is frequently used as a refractory material, and seems to be the only material which is used as "grog." I find no suggestion anywhere that sand is ever used as a "grog," and if it be that a material has been used as grog, seemingly, according to the definitions obtaining in the art, it must have been a clay—no instance of sand being used as a grog being given or considered.

In addition, from a very careful inspection of the material received in evidence and transmitted by the referee, I can come to no conclusion other than that it is clay, instead of sand. True it is, as the physical analysis and as the definitions would seem to indicate, there is a little sand present in it. This, however, would not serve to give the entire commodity the quality of, or subject it to classification as, "sand." If the material be rubbed in the hand for a few moments, it is found to be composed of a very fine impalpable flourlike powder; it imparts a peculiar soapy or greasy feeling, and it leaves a distinct and not easily removable white chalk-like mark upon the hand or surface upon which it is rubbed. The sample in evidence is as large as one's fist. It is perfectly dry, and yet is firmly coherent, so much so that it cannot be crushed between one's two hands, although it will break apart when struck a sharp blow. A parcel of sand, I apprehend, in a similar dry state, would almost fall apart of its own weight, and assuredly could be easily crushed into its individual particles. A piece as large as the end of one's thumb was pulverized in the palm of my hand, and I could feel two or three small grains of sand. The balance seemed to be so finely pulverized that individual grains could not be discerned. In spite of the suggestion of the witness who worked at the bankrupt plant, upon being wetted the substance becomes plastic, and was by me moulded as clay usually is. It possesses the usual tenacious character or quality of clay. A small portion being dissolved in a glass of water, as suggested by the Britannica, it remained in solution for a number of hours, and while there was a conspicuous deposit of clayey material at the bottom of the glass, nevertheless a considerable portion of the material seemingly remained in suspension. Magnesia is present, in keeping with the asserted constant character of clay. The loss of water by ignition is demonstrated by the analyses made, and the percentages of silica and alumina found in the samples are fairly corroborative of the statements of the authorities quoted. I think an examination of the substance itself shows that it is clay, and that in consequence the referee was wrong in his conclusion to the contrary.

The commodity entered only into the manufacture of sewer pipe. No suggestion is made anywhere that it is true "china clay or kaolin." Its want of purity, together with its marked discoloration (bluish in color when fractured), due to impurities, renders it apparently unfit for the manufacture of porcelain, and therefore takes it out of the excepting clause found in the published schedules and noted hereinabove. Geikie, supra, p. 158; Dana, supra, 1, 84; Americana, title "Kaolin." The "crude clay" rate, therefore, controls.

Due to the disputed construction of a stipulation in the record, there seems to be some question presented as to whether or not the transportation·charge of the material shipped from Alberhill to Tropico was entirely paid for, or paid for as "sand," when it should have been paid for as "clay." As suggested hereinabove, the waybills show it was shipped as "clay." Presumably, therefore, it could hardly have been paid for as sand, and I am rather led to the belief, as contended for by claimant, that the stipulation entered into by it was not intended

in any wise to cover the shipment from Alberhill, and that no payment of any part of that transportation charge has been made.

For this reason, the matter will be re-referred to the referee, with directions to take evidence on this last-mentioned feature of the case, and then take such action respecting the allowance of the entire claim as may not be inconsistent with the views hereinabove announced.

[5, 6] Some reference is made to an action of the state Railroad Commission. It is apparent from the report of the decision of that body that it is in no wise relevant to the controversy here. Obviously the proceeding there concerned an effort made by claimant to eliminate entirely the "sand" rate from Ione to Tropico. There was some testimony as to whether certain materials were sand or clay, but relief was denied by the Commission because it appeared, on objection to the application, that there was material at Ione, incontrovertibly sand, demanding shipment, and in consequence a sand rate was still necessary. There was no finding by the Commission, and there could have been none, that the material in controversy here was either sand or clay; no order by the Commission, as there could have been none, that the material actually hauled by claimant should be paid for at a rate different from that established by the published schedules. What rate shall be established for the hauling of a specified commodity is an administrative or legislative question, and therefore properly determinable by the Commission; what a given commodity is is a judicial question, over which, obviously, the Commission has no jurisdiction.

The order of the referee is annulled, and the matter is re-referred to him, with directions to proceed as indicated hereinabove.