[No. 31502.   Department Two.   January 26, 1951.]

ANDREW FLOE et al., *Respondents*, v. CEDERGREEN FROZEN
PACK CORPORATION, *Appellant.*[1]

[1]Reported in 226 P. (2d) 871.

*Kerr, McCord & Greenleaf* and *R. A. Moen*, for appellant.
*Howard C. Graham*, for respondents.

ROBINSON, J.—Appellant, Cedergreen Frozen Pack Corporation, is a concern engaged in the business of preparing and selling frozen foods. It owns and operates a seven-hundred-acre farm near Quincy, Washington, which, in 1948, was partially devoted to the raising of peas. During the early part of the summer of that year, it was necessary to transport these peas to Mount Vernon, Washington, for freezing in appellant's plant there. This was done, in part, by trucks operated by respondents' transfer company. Payment to respondents was made in accordance with the rate schedule for the hauling of fresh vegetables established by the department of transportation of the state of Washington. We may note parenthetically that this department has since been consolidated into the public service commission; for convenience merely, we shall refer to it throughout this opinion as the "department."

After the haul had been completed and paid for, the department caused an investigation to be made and determined that the peas had been improperly classified as "fresh." In accordance with this determination, respondents submitted new bills to appellant. Appellant had previously been charged at the rate of fifty cents per hundred pounds

of peas transported; under the changed billing, it was charged one dollar and fourteen cents per hundred pounds. A total of 625,710 pounds of peas had been transported. The difference between the charge for the haul at the former rate and at the latter rate amounted to $4,124.70. Appellant refused to pay this difference, and respondents brought suit to recover it. Judgment was entered in their favor, and it is from this judgment that appeal has been taken.

The rate for fresh peas was set forth in item 1180, page 68-A, 13th Revised, Tariff No. 6, issued by the director of transportation. In that item is found the qualification "(subject to Item 630)." It is upon the language of this latter item that the department based its determination that the peas had been erroneously classified as fresh. It reads as follows:

"Item 630. Where reference is made to this item rates covering transportation of Fruits or Vegetables, Fresh (including Berries), will not apply on Fruits or Vegetables, Cold Pack, Frozen, Pre-cooled or partially processed, nor will such rates apply on Fruits or Vegetables requiring special protective services or the maintenance of specified temperatures."

Respondents do not contend that these peas were cold pack or frozen. They argue, however, that they were both partially processed and precooled, and urge further that they required "special protective services" in the form of insulated trucks. It is their position that the peas consequently came within the exception set forth in item 630, and that appellant was never entitled to the lower rate allowed for the transportation of fresh peas.

Since respondents' position was the result of a determination made by officials of the department, they argue that appellant has no right to question it in this particular action. They point to Rem. Supp. 1947, § 6382-30, which gives the right of appeal by writ of review from a decision or order of the department to any "motor carrier, complainant, protestant or other person adversely affected" thereby; and to the language of *South Bay Motor Freight*

*Co. v. Schaaf*, 3 Wn. (2d) 466, 472, 473, 101 P. (2d) 584, 587, wherein we said:

"The statute prescribes the method by which an order of the department may be questioned, which is by a writ of review. This method is exclusive (*Willapa Power Co. v. Public Service Commission*, 110 Wash. 193, 188 Pac. 464), and only by means of such a writ does the court have jurisdiction to pass upon any such order, unless it appears that the department has exceeded its authority in making any such order."

█ The order involved in the *South Bay Motor Freight Company* case, however, was one fixing rates, which had been issued in pursuance of the rate-making power of the department. The "order" with which we are here concerned, if it can properly be so termed, had no other legal effect than to authorize the carrier to maintain an action against the shipper for the alleged undercharge. In this action, the merits of the departmental decision were properly up for consideration just as if the suit had been one for the recovery of an overcharge, brought by the shipper after the department, acting under the authority of Rem. Supp. 1943, §§ 10433 [P.P.C. § 826-1] *et seq.*, had determined that such recovery was warranted. *State ex rel. Tacoma Eastern R. Co. v. Public Service Commission*, 112 Wash. 629, 192 Pac. 1079; *Tacoma Grain Co. v. Northern Pac. R. Co.*, 123 Wash. 664, 213 Pac. 22. Whether there had in fact been an undercharge depended upon whether the peas had been incorrectly classified under the tariff which the commission had issued; and this, in the final analysis, was purely a judicial question, which could only be settled in the courts. *In re Independent Sewer Pipe Co.*, 248 Fed. 547, 554; *Pennsylvania R. Co. v. Fox & London*, 93 F. (2d) 669. See, also, *Nashville C. & State L. Ry. v. Breman*, 75 F. Supp. 539; and *American Ry. Express Co. v. Magnolia Fish & Oyster Co.*, 255 S. W. (Tex. Civ. App.) 459. We think that the appellant did not err in putting the correctness of the department's determination in issue.

Turning now to the evidence, the testimony showed that, after the peas were harvested in the field, they were fed

into a viner, in which they were shelled. From here they were put through a cleaning mill, the purpose of which was to remove the chaff, leaves, pods, and any other foreign material which might have been mixed in with the peas. They were then dropped into a flume containing running water and some ice, in which they were transported about twelve feet to a loading platform. After they had gone through the flume, they were placed in lug boxes. A shovelful of ice was placed on the top of each lug box, and the boxes were then loaded into respondent's trucks for transportation to Mount Vernon.

Did this treatment constitute either partial processing or precooling within the meaning of item 630? Considering the former point first, it is apparent that the term "partially processed," standing alone, is extremely vague. It seems to have been agreed that the reference in item 630 was to partial processing for freezing, canning, or other preservation. Respondents' witness, Mr. Burns, said he knew of no other kind. But beyond that there was considerable dispute. There is little doubt that what was done to the peas in Quincy prior to their transportation could conceivably be designated as "partial processing" without doing any violence to the literal meaning of the words; in fact, it appears that, since the institution of this suit, the department has amended the language of item 630 so that it now reads:

"Rates covering transportation of . . . . Vegetables, Fresh . . . will not apply on . . . Vegetables . . . Precooled or Partially Processed (including shelled, husked or peeled) . . ."

Clearly, if peas which have merely been shelled can be termed "partially processed," and there seems to be no reason why they cannot, then so also can peas which have been shelled, cleaned, passed through cold water, and iced. Therefore, the dictionary definitions, which both appellant and respondents have quoted to us, are of little assistance in solving this problem. The question here is, not what "partially processed" might signify in the various contexts

in which it could conceivably be used, but what it actually meant as it was employed in item 630.

As of the time these peas were hauled, the department had issued no ruling defining the meaning of "partially processed," as so employed, and there was an irreconcilable variation in the opinion of the witnesses as to its correct import. It is particularly significant that this was true even as between the two witnesses for the respondents, although they both agreed that the peas here involved had properly been classed as "partially processed." Thus Mr. White, who formerly worked in the department, and who testified that he had been engaged in transportation work since that time, stated that, if the peas had been shelled, but no more had been done to them, they would, in 1948, have been hauled at the fresh vegetable rate. But he testified that, if these shelled peas had merely been covered with ice, he would then consider that they were partially processed; and further, that, if nothing else appeared but that they had been run through the cleaning mill to have the chaff and leaves removed, he would so regard them. On the other hand, Mr. Burns, the present assistant chief of the tariff section of the public service commission, testified that shelling the peas and icing them, would not, in 1948, have constituted partial processing; that merely cleaning them would not have done so (he testified that "apples, for example, are washed to take off the spray. It doesn't change them in any respect."); but that "precooling" them by immersing them in water would have been sufficient to change their classification.

The testimony of appellant's four witnesses was somewhat more consistent. Typical was that delivered by Mr. Geisness, who had formerly been employed by the department of transportation and who testified that his main duty there had been to interpret the tariff. He stated that peas treated as the Quincy peas had been treated, would be entitled to the rate applicable to fresh vegetables. Mr. Cedergreen and Mr. Day, both employees of appellant, described the steps actually involved in the "processing" of peas, as they understood that term. They testified that peas were

first brought to the freezing plant and cleaned; washed in a special machine under a high pressure spray; blanched under a temperature of about two hundred ten degrees for ninety minutes or more; cooled; separated into two grades; and sorted. They were then "pre-cooled" down to a temperature below freezing, and finally subjected to subzero temperatures, from which they emerged frozen hard. Both Mr. Cedergreen and Mr. Day testified that none of the treatment to which the peas were subjected at Quincy eliminated any of these processing steps. Mr. Day, it is true, qualified this statement with the remark that it might have eliminated a little of the cleaning, but testified that the peas on arrival at Mount Vernon were put through the cleaning mill even so.

What then constitutes "partial processing"? Mr. Day gave this answer:

"A. 'Partially processed' peas in my understanding would be peas that have been blanched. After they are blanched, the nature of the pea is changed. It ceases to be a fresh pea. It is a partially cooked pea, then. Up to that point it is a fresh pea."

This was confirmed by Mr. Heitfeld, production manager for Stokely Foods for the state of Washington, who stated:

"A. 'Partially processed' in the industry is when a product changes character due to application of heat or temperature, or the application of freezing temperatures to the product."

Mr. Day testified that peas which had actually been precooked or blanched had been hauled by the respondent company; and, needless to say, neither he nor Mr. Heitfeld was of the opinion that the peas involved in the present action could properly have been termed "partially processed."

We have held that, in interpreting a tariff, the terms used, when they are not defined therein, should be taken in the sense in which they are generally understood and accepted commercially. *Northern Pac. R. Co. v. Sauk River Lbr. Co.*, 160 Wash. 691, 295 Pac. 926.

It is the general rule that, if a tariff is addressed to a special class of shippers and uses words which have a

particular or customary import among such class of shippers, that meaning should apply. 13 C. J. S. 705, Carriers, § 303. "For example," said the court in *Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co.*, 66 F. (2d) 965, "if a tariff provided a lower rate upon 'culls' in apple shipments, that word must find its definition in what apple shippers honestly regard and treat as 'culls.'" The rule, of course, was worked out to fit cases wherein the carrier itself had prepared the tariff, but it would seem equally reasonable to apply it to situations such as that presented by the case at bar, wherein the tariff was promulgated by a regulatory body. In either case, the shipper should be entitled to rely on the words employed as having the meaning usually attached to them in his business or industry. If the regulatory body intends that they have another meaning, this ought to appear from the language of the tariff itself.

In the present case, it is apparent from the testimony of the respondents' two witnesses that they had no very clear idea, or at least were not in agreement, as to precisely which of the steps taken at Quincy were sufficient to change the classification of the peas from "fresh" to "partially processed." But appellant's witnesses, Mr. Day and Mr. Heitfeld, testified specifically that, in their comprehension, a pea did not cease to be fresh and become partially processed until its character had been changed by the cooking, or, as Mr. Heitfeld stated, by the application of freezing temperatures. It is true that Mr. Cedergreen was willing to concede that a pea might be considered as partially processed at any time after it had begun to go through the continuous procedure established at the plant, which leads to eventual freezing. But, in any case, so far as what was done to the peas at Quincy was concerned, all four of appellant's witnesses were unanimous in stating that none of the steps there taken amounted to "partial processing," as they understood that term. For example, from the testimony of Mr. Day and Mr. Cedergreen, it appeared that the running of the peas through the water-filled flume, which Mr. Burns regarded as having the effect of partially processing them,

was not at all the same as the washing which the peas must undergo just prior to freezing. Neither this nor any other of the steps taken at the Quincy plant amounted to a substitute for any of the procedure, necessarily preliminary to the freezing of the peas, which was later carried out at Mount Vernon.

It would seem, therefore, that not only were the respondents' witnesses (both of whom, as we have noted, were, or had been, employed by the department) uncertain as to which of the steps taken at Quincy amounted to partial processing, but that the department's decision that any of them did was not in accord with what the testimony demonstrated was the understanding prevalent in the frozen foods industry as to the meaning of "partially processed." Nor, for all that appears from the evidence, had the department previously indicated that it was placing this significance on these words. Mr. Cedergreen testified that he had been shipping peas treated in this manner from the Quincy farm for nine years, and that, prior to this determination of the department, no one had suggested that they were not entitled to be shipped at the fresh vegetable rate. In the present instance, both the shipper and the representative of the carrier to whom he talked assumed the fresh vegetable rate applied, contracted on that basis, and carried the contract to completion on that understanding. It is perfectly possible, of course, that either or both of them acted in bad faith, and with knowledge, or at least with a suspicion, that the partially processed rate was the proper one. But the evidence suggests the contrary. To allow the department at this stage to place a novel interpretation upon the words "partially processed" after the shipper had become obligated under a tariff which used that term in what he might reasonably have supposed was its standard or usual sense, would be unconscionable; and this is particularly true when the two witnesses produced from the department were unable to agree on just which of the features of the Quincy treatment rendered the peas "partially processed" and thus subject to the higher rate.

In so holding, we are entirely mindful of respondents' contention that, because the basic question presented involves the department's interpretation of one of its own rules, we have no right to substitute our judgment for that of the department. It is true that this court, in common with others, is thoroughly committed to a policy of judicial self-restraint with respect to the questioning of decisions of administrative bodies, when these agencies have acted within the ambit of their proper competence. But we have always reserved the right to interfere with such decisions where it appears that they have displayed a disregard of the material rights of the parties to a controversy. See *State ex rel. Model Water & Light Co. v. Department of Public Service*, 199 Wash. 24, 90 P. (2d) 243; *Manlowe Transfer & Distributing Co. v. Department of Public Service*, 18 Wn. (2d) 754, 140 P. (2d) 287, 155 A. L. R. 928. We do not hesitate to do so here.

Similar reasoning applies with reference to respondents' contention that these peas were "pre-cooled" within the meaning of item 630. It is true that they were run through water in a flume which contained ice, and that ice was placed on them before they were loaded onto the trucks. But all of the testimony demonstrated that "pre-cooling" is a term of special and definite meaning in the frozen foods industry. Mr. Cedergreen, Mr. Day, Mr. Heitfeld, and Mr. Geisness all testified that "pre-cooling" means bringing the peas down to a temperature of around thirty-four degrees in order that the bacterial or enzymatic activity in them may be retarded and the peas preserved for a longer period. Respondents do not deny that this is the usual industry meaning of "pre-cooling," but, in their brief, contend that the industry meaning is immaterial in a tariff having reference to the transportation of a product. For the reasons we have pointed out, however, the shipper normally has the right to assume that terms used in such a tariff are employed in the sense in which his industry understands them, unless the tariff contains some language to the contrary. No one argues that the Quincy operations

"pre-cooled" the peas in this sense; and, as Cedergreen was entitled to understand that this was the significance in which the terms were used in the tariff, it cannot be charged at the higher rate specified for precooled vegetables. It is doubtless true, as respondents contend, that we should give some consideration to the understanding which the trucking industry places on the term "pre-cooled." But, except for inferences to be drawn from the testimony of respondents' truck drivers, who, in a matter of this kind, were in reality testifying as laymen, there was no evidence presented to show that the meaning the trucking industry places on the term "pre-cooled" is any different from that attached to it by the frozen foods industry.

■ Respondents finally contend that, because the peas were transported in insulated trucks, they required special protective services within the meaning of item 630, and were not entitled to the fresh vegetable rate for that reason. There is no dispute that transportation in insulated trucks is encompassed within the meaning of "special protective services," and it is conceded that the peas were hauled in trucks of this type. As to whether the summer heat made it necessary to use these trucks, there was considerable disagreement in the testimony, respondents' witnesses contending that it did, appellant's that it did not. But the determinative factor in the matter is that Mr. Cedergreen did not ask for insulated trucks, but requested merely that covered trucks be used. If, upon its own initiative, the carrier determined that insulated trucks were required, and then used them, it may not treat that circumstance as a basis for charging the shipper a higher rate than that for which he would have been liable had trucks of the type he ordered been employed.

The judgment is reversed and the cause remanded to the trial court, with instructions to dismiss the action.

SCHWELLENBACH, C. J., MALLERY, HILL, and GRADY, JJ., concur.

March 16, 1951. Petition for rehearing denied.