[No. 23113-8-I.   Division One.   December 11, 1989.]

WHIDBEY ISLAND MANOR, INC., *Respondent,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant.*

246

*Kenneth O. Eikenberry, Attorney General,* and *Gretchen Leanderson, Assistant,* for appellant.

*John F. Sullivan,* for respondent.

WEBSTER, J.—Washington State Department of Social and Health Services (DSHS) appeals a superior court judgment which reversed a decision of a DSHS review judge. A provider of nursing home services had contested DSHS's calculation of Medicaid reimbursement and the review

judge ruled in favor of DSHS. We affirm the Superior Court.

Whidbey Island Manor, Inc. (Whidbey), a contract provider of nursing home services, operates two nursing homes in Washington—Whidbey Island Manor and Barth Nursing Home. Whidbey's patients include persons whose expenses are paid by Medicaid, a state–funded nursing home cost reimbursement system established under RCW 74.46.

This dispute concerns the amount of Medicaid reimbursement for Whidbey's services rendered during the 1983 calendar year. In 1983, the Medicaid system reimbursed contract providers in four areas: (1) patient care, (2) food, (3) administration and operations, and (4) property. Former RCW 74.09.610 (1981). The property category included a return on net invested equity (ROE) for each facility. Former RCW 74.09.610(5) (1981). ROE essentially consisted of a "netting" or a calculation of assets minus liabilities of equity capital. A regulation defined equity capital as

> total tangible and other assets which are necessary, ordinary, and related to patient care from the most recent provider cost report minus related total long–term debt from the most recent provider cost report plus working capital [defined elsewhere in the regulation].

WAC 388–96–010(22) (Supp. 1981).

By regulation, DSHS conducted Medicaid reimbursement in three stages: (1) initial rate setting—based on cost reports submitted by the contractor, (2) DSHS's audit of the contractor's annual cost report, and (3) settlement. WAC 388–96–101, –204, –220. DSHS paid contract providers during the rate year based on an annual cost report covering the previous year which the contractor submitted to DSHS. DSHS had the option to audit a contractor's cost report which involved review of financial statements and reports, and the contractor's record–keeping and accounting

practices. WAC 388–96–204, –207, –210. Contractors submitted a proposed settlement report which calculated reimbursement as the lower of the prospective reimbursement rate or audited allowable costs. WAC 388–96–220(1). If an audit was conducted, DSHS issued a final settlement report to the contractor. This report compared the prospective rate at which the contractor was paid during the report period weighted by the number of patient days with the contractor's audited allowable costs. WAC 388–96–224(1). The contractor then refunded overpayments to DSHS or DSHS paid underpayments to the contractor. WAC 388–96–220(4).

For final settlement of the 1983 calendar year, DSHS audited Whidbey's balance sheets for 1981 and 1982 calendar years. DSHS compared Whidbey's *reported* balance sheet ROE figures for December 31, 1981, and December 31, 1982, with the *audited* balance sheet net equity figures for those same periods. DSHS's justification for this procedure was that at the time of the initial rate setting on January 1, 1983, the most recent desk reviewed cost report was 1981; for July 1, 1983, 1982 was the most recent report.[1] The audited figures were lower than the reported figures and DSHS requested refunds of $1,542 and $3,426 from Whidbey's two nursing homes.

Whidbey disagreed with the Department's settlement figures. Whidbey argued that DSHS failed to follow former RCW 74.09.610(5) and former RCW 74.46.525(2) which stated that ROE reimbursement rates "shall" be paid utilizing applicable federal Medicare rules and regulations. Under the federal system, Whidbey contended, ROE settlement should have been based on actual average equity for the period in question, not equity figures for prior periods as DSHS had done in its final settlement of the 1983 rate period.

---

[1]Former WAC 388–96–750(1), (2), and (3) (1980) required DSHS to pay ROE reimbursement to a contractor based on a contractor's most recent desk reviewed cost report.

Whidbey appealed DSHS's final settlement rate pursuant to WAC 388–96–904, and an administrative law judge (ALJ) ruled in favor of Whidbey. The ALJ determined that DSHS failed to utilize federal regulations in calculating Whidbey's ROE reimbursement. The ALJ required DSHS to recalculate the ROE final settlement based on the average actual equity during 1983.

DSHS appealed this ruling pursuant to WAC 388–08–413(3), and a DSHS review judge reversed the ALJ's decision. The review judge held that DSHS was not required to follow the federal regulations in calculating ROE settlement rates.

Whidbey appealed this decision to Island County Superior Court pursuant to former RCW 34.04.130. The Superior Court reversed the review judge's decision and reinstated the ALJ's initial decision.

DSHS appealed the superior court judgment to this court pursuant to former RCW 34.04.133.

DISCUSSION

■■ The review judge's decision is an administrative adjudication; this court's review is governed by former RCW 34.04.130(6).

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or
> (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
> (f) arbitrary or capricious.

Interpretation of the statute governing reimbursement rates and the regulations implementing it is purely a question of law. Questions of law are reviewed under the "error of law" standard of former RCW 34.04.130(6)(d). *Clark v.*

*Horse Racing Comm'n*, 106 Wn.2d 84, 88, 720 P.2d 831 (1986). Under this standard, this court may substitute its judgment for that of the administrative body, although substantial weight is accorded an agency's interpretation of the law. *Clark*, at 88; *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983).

Two statutes require construction. During the first half of 1983, RCW 74.09.610(5) (1981), *repealed by* Laws of 1983, 1st Ex. Sess., ch. 67, § 48, provided:

> The return on net invested equity for each facility *shall* be determined by utilizing medicare rules and regulations.

(Italics ours.) During the remainder of 1983, another statute read:

> The department *shall* pay a return on net equity, as defined in federal medicare rules and regulations, at the annual rate of twelve percent, except that this return shall not exceed two dollars per patient day.

(Italics ours.) Former RCW 74.46.525(2). This section applied to rate setting from July 1, 1983, through the end of the 1983 calendar year. Former RCW 74.46.525(1).

DSHS first contends that the above statutes require calculation of ROE utilizing federal Medicare rules and regulations only to the extent that the federal rules are useful. DSHS maintains that the federal regulations and rules are not useful in determining ROE settlement because of several differences between the two reimbursement systems: (1) The state system pays contractors based on prospective rates while the federal system reimburses retrospectively based on costs reported by the contractor; (2) the state system uses one annual cost report while the federal system averages monthly figures; (3) the state system operates on a calendar year basis while the federal system operates monthly. DSHS argues that former WAC 388–96–750 modified the federal regulations and set forth the procedure to calculate ROE final settlement. WAC 388–96–750 provided in pertinent part:

**Return on investment.** (1) Beginning January 1, 1979, the department will pay a return on equity to proprietary contractors utilizing applicable Medicare rules and regulations as of July 1, 1979, with the following modifications:

(a) Monthly equity calculations will not be used. A desk review of reported equity will be conducted pursuant to WAC 388–96–201. The average ratio among proprietary contractors of current assets to expenses will be computed from the most recent desk reviewed cost reports. The standard deviation of the ratio and the average ratio plus one standard deviation will also be computed. Current assets in excess of the average ratio plus one standard deviation will not be allowed unless the contractor can document that the excess is ordinary, necessary, and related to patient care. No adjustments will be made to reported equity insofar as changes reflect additions to fixed assets which are ordinary, necessary, and related to patient care.

(b) Good will is not includable in the determination of net equity.

(c) Net equity and the payment for net equity shall be calculated as described in subsections (2) and (3) of this section.

(2) A contractor's net equity will be calculated using the appropriate items from the contractor's most recent desk reviewed cost report utilizing the definition of equity in WAC 388–96–010 and applying relevant Medicare rules and regulations as of July 1, 1979, with the modifications described in subsection (1) of this section.

(3) The contractor's net equity will be multiplied by the Medicare rate of return on equity capital for the twelve–month period ending on the date of the closing date of the contractor's cost report. This amount will be divided by the contractor's annual patient days for the cost report period to determine a rate per patient day. Where a contractor's cost report covers less than a twelve–month period, annual patient days will be estimated using the contractor's reported patient days.

(4) The information on which the return on equity is calculated is subject to field audit. If a field audit determines that the desk reviewed reported equity exceeds the equity which can be documented and calculated in conformance with Medicare rules and regulations as modified by this section, the contractor's return on equity rate for the rate period during which a return on equity rate calculated on the basis of that cost report was in effect shall be recalculated using the determinations of the field audit. Any payments in excess of this rate shall be refunded to the department as part of the settlement procedure established by [this chapter].

Former WAC 388–96–750 (Supp. 1981).

Whidbey acknowledges that former WAC 388–96–750 modified in several ways the federal rules and regulations. Whidbey simply contends that those modifications must be interpreted narrowly, and that the federal rules must otherwise control the calculation of ROE.

The federal regulation relevant to the dispute, 42 C.F.R. § 405.429(b)(4) (1983), provided:

> *Computation of return of equity capital.* For purposes of computing the allowable return, the amount of equity capital is the average investment during the reporting period. The rate of return allowed, as derived from time to time based upon interest rates in accordance with this principle, is determined by the Health Care Financing Administration and communicated through intermediaries.

At the time of the 1983 settlement, WAC 388–96–224(1) provided:

> **Final Settlement.** (1) If an audit is conducted, the department shall issue a final settlement report to the contractor after completion of the audit process . . . The final settlement report shall compare the prospective rate at which the contractor was paid during the report period, weighted by the number of patient days reported for the period each rate was in effect as verified by audit, to the contractor's audited allowable costs for the reporting period.

██ The Department's argument that the federal regulation need not be followed is without merit. The term "shall" is presumed to create an imperative duty rather than conferring discretion. *Crown Cascade, Inc. v. O'Neal,* 100 Wn.2d 256, 261, 668 P.2d 585 (1983). Former RCW 74.09.610(5) used the term "shall" in directing DSHS to determine ROE based on federal regulations; former RCW 74.46.525(2) stated that DSHS *shall* pay ROE as defined by federal regulation. Both statutes created an imperative obligation to compute ROE using federal regulations. DSHS, by way of administrative rules, regulations, or interpretation of statutes, has no authority to amend legislative enactments. DSHS is bound by the language of former RCW 74.09.610(5) and former RCW 74.46.525(2). *See UW v. Manson,* 98 Wn.2d 552, 562, 656 P.2d 1050 (1983).

The Department argues that the term "shall" as used in former RCW 74.09.610(5) and former RCW 74.46.525(2) has a directory rather than a mandatory meaning. *See Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 464, 553 P.2d 1316 (1976). DSHS asserts that the Legislature intended to allow the Department to ignore the federal regulations because of numerous differences between the federal and state systems. DSHS cites no authority which states that when differences exist between the two systems all of the federal regulations must be ignored. RCW 74.09-.120 directs DSHS to adopt regulations for accounting and reimbursement of nursing homes caring for Medicare patients. At the same time, the Legislature mandated that DSHS reimburse net equity as defined under federal rules and regulations. Former RCW 74.09.610(5) (1981); RCW 74.46.525(2). The Legislature intended to give DSHS the authority to enact reasonable regulations to implement a reimbursement system based on already existing federal regulations.

DSHS also argues that 42 C.F.R. § 405.429(b)(4) is inapplicable because it used the term "average." The state system as it existed in 1983 was designed to reimburse actual figures at final settlement. Actual, precise figures are logically preferable to averaged figures. The state system need not be interpreted to require the use of averages when actual figures are available.

Contrary to DSHS's assertion, the federal rules and regulations are in many ways consistent with and applicable to the state system. Specifically, the structure of the state system has both prospective and retrospective attributes. It is prospective in that contractors are paid during a given rate period amounts based on prior period annual cost reports. The system is retrospective because in the settlement phase of the reimbursement process—at the conclusion of a rate period—a contractor's cost report for the period is audited and if the contractor is reimbursed in excess of its actual entitlement, then it must repay the excess to the Department. WAC 388–96–220(4).

■ We hold that former RCW 74.09.610(5) and former RCW 74.46.525(2) required DSHS use federal regulations to calculate ROE. The settlement procedure set forth in former WAC 388-96-224(1) required DSHS to compare rates paid to a contractor with the contractor's actual audited rates. This regulation must be applied consistently with the federal regulations as required by former RCW 74.09.610(5) and former RCW 74.46.525(2).

DSHS defends its actions here by arguing that former WAC 388-96-750 required the 1983 final settlement for ROE to be based on audits of the cost reports from 1981 and 1982. DSHS maintains that the language contained in former WAC 388-96-750(2), "most recent desk reviewed cost report," required the use of audit figures from 1981 and 1982 to arrive at Whidbey's 1983 final settlement. We disagree.

Subsections (1), (2), and (3) of former WAC 388-96-750 all addressed computation of ROE at the initial *rate-setting* phase of reimbursement. The first sentence of the first paragraph stated, "the department will pay . . .". WAC 388-96-101 requires contractors to submit annual reports which essentially serve as estimates for the upcoming rate period. The contractors received payments during this period based on this initial rate; DSHS made payments to contractors only during the initial phase of reimbursement. The reference to "will pay" clearly and unequivocally indicated that this portion of the regulation applied to the initial rate-setting phase. Subsections (2) and (3) also applied to this same rate-setting phase of reimbursement. Subsection (1)(c) stated that the calculation of net equity for this initial rate period is defined in subsections (2) and (3) of WAC 388-96-750. Thus, the reference to most recent cost report applied to the initial rate-setting phase of reimbursement.

In contrast, subsection (4) of former WAC 388–96–750 addressed ROE computation at the *settlement* phase of reimbursement. The section stated in part: "If a field audit determines that the *desk reviewed reported equity* exceeds the equity *which can be documented and calculated* [in light of the above modifications of the federal regulations], the contractor's return on equity rate . . . shall be recalculated". (Italics ours.) Nowhere in subsection (4) did the regulation reference "most recent desk reviewed cost reports." The reason for this is that at settlement, actual figures are known. Instead of referencing cost reports for prior periods, initial rates are compared to audited rates which can be documented and calculated. Any payments in excess of the audited figures shall be refunded.

■ DSHS has erroneously interpreted this regulation to require it to audit ROE figures from previous years. Its interpretation would mean that final settlement for a current year would be based on figures from previous years. Nothing in WAC 388–96–750 required this. "An agency's interpretation of its own regulations is entitled to considerable deference by the courts, unless the interpretation is unreasonable." *Hart v. Bowen*, 799 F.2d 567, 569 (9th Cir. 1986). *See also Floe v. Cedergreen Frozen Pack Corp.*, 37 Wn.2d 886, 895, 226 P.2d 871 (1951) (court rejected agency's interpretation of its own rule because agency's interpretation disregarded the material rights of the parties to the controversy). We conclude that DSHS's interpretation of WAC 388–96–750 is unreasonable.

WAC 388–96–750 required DSHS to base ROE rates at the initial rate–setting phase on the most recent year's cost report ROE figures. Then, at the settlement phase of the process, DSHS must audit the current year's ROE and adjusts the rates paid during the year to reflect actual rather than estimated figures.

The field audit requirement found at WAC 388–96–204, which must be performed prior to settlement, would make no sense if it did not determine *actual* ROE figures for a given *current* rate period. An audit of any period except the current one would be purposeless. Indeed, WAC 388–96–224(1) requires DSHS to adjust the reimbursement that the contractor received during the rate period to reflect *actual* ROE. Moreover, using audits to ensure that reimbursement reflects actual costs for a current rate period parallels the federal system. 42 C.F.R. § 405.405(c) (1983) stated:

> Basically, therefore, interim payments to providers will be made for services throughout the year, with final settlement on a retroactive basis at the end of the accounting period. . . . Retroactive payments will take fully into account the costs that were actually incurred and settle on an actual, rather than on an estimated basis.

At settlement, the Department must compare the prospective rate *paid* to the contractor *during the report period* with the contractor's *audited* allowable costs *for the current period.* WAC 388–96–224(1).

Finally, DSHS argues that the Superior Court exceeded its authority under former RCW 34.04.130(6) by reinstating a reversed ALJ's decision. In support of this argument, DSHS cites *Skold v. Johnson,* 29 Wn. App. 541, 630 P.2d 456 (1981).

■ DSHS misapplies *Skold. Skold* states that a reviewing court has no authority under former RCW 34.04.130(6) to modify an agency's decision. *Skold,* at 549. Here, the Superior Court did not modify the review judge's decision; the Superior Court reversed it. A reviewing court has express authority to do so under former RCW 34.04.130(6). Because the ALJ's decision was a prior administrative adjudication, a necessary result of reversing the review judge was to reinstate the ALJ's decision. The trial court did not exceed its authority.

The decision of the review judge was correctly reversed by the Superior Court. We affirm.[2]

COLEMAN, C.J., and PEKELIS, J., concur.

[Nos. 22266–0–I; 22267–8–I;   Division One.        December 11, 1989.]
22268–6–I; 22753–3–I;
22754–8–I.

[2]Many of the statutes discussed in this case have been either repealed or changed. However, counsel for the State informed the court at oral argument that other cases involving the same statutes are pending. We, therefore, publish this opinion.