ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY

v.

UNITED STATES.

No. 507–56.

United States Court of Claims.
July 15, 1960.

Raymond A. Negus, Washington, D. C., for plaintiff. Lawrence Cake and John Guandolo, Washington, D. C., were on the briefs.

Lewis A. Dille, Kensington, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Paris T. Houston, Washington, D. C., was on the briefs.

DURFEE, Judge.

Plaintiff and connecting lines transported liquid milk in quart fiber cartons for defendant in 1943, 1944, and 1946 from Healy Station, Illinois to Pensacola, Florida for consumption by personnel at military installations in that area. Plaintiff brings this suit for the benefit of the initial carrier, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, also called the Milwaukee. The intermediate carrier was the Illinois Central.

Prior to May 1943 the defendant had been shipping about two cars of fresh fluid milk daily in passenger baggage service, which milk was brought to the loading platforms of the outbound carriers by motor transport. With the approach of hot weather, defendant was desirous of expediting the anticipated milk shipments by having them picked up at the dairy in passenger refrigerator cars which could be switched in such a way as to make connections with scheduled trains of the line haul carriers. The supplying dairy was the Borden Co. plant at Healy, Illinois which is serviced only by the Milwaukee as terminal carrier. Healy is within the Chicago Terminal Area although it is not within the passenger switching area of Chicago.

In May 1943 the defendant inquired of the Milwaukee whether it would be possible for it to handle shipments of milk directly from the Borden plant to make connections with various scheduled trains moving out of Chicago for points in the South. The defendant suggested that Western Trunk Line (WTL) Tariff No. 375–C might apply and that it desired that those rates be applied unless plaintiff knew of a more equitable manner in which to bill for the traffic.

Plaintiff replied that WTL Tariff No. 375–C was applicable, that the Clinton Junction, Wisconsin rate was appropri-

ate for traffic from Healy, and that connections could be made with the appropriate trains. In a later communication to plaintiff, the defendant specified the Illinois Central and Pennsylvania Railroad trains which plaintiff would have to meet, and it prescribed the daily hours at which the milk would have to be picked up in order to make those connections.

In handling this traffic, the Milwaukee would spot the empty refrigerator cars at the Borden plant early each morning. Later in the morning, the Healy patrol, a freight switching crew regularly assigned to that vicinity, would deliver them to a side track at Pacific Junction about 2½ miles away. From that point a passenger switching crew of the Milwaukee would move the cars to the Illinois Central station in Chicago where connections would be made with the designated trains. This passenger switching crew occasionally moved other traffic along with the milk cars. The total distance from the Borden plant to the Illinois Central station is about ten miles. On Sundays the above mentioned service was the only one performed by the Healy patrol.

In performing the described services the cars containing the milk passed over the passenger tracks of lines other than the Milwaukee. Pursuant to agreements among the carriers in the Chicago area, the Milwaukee paid from $24.30 to $29.50 per movement for the use of these tracks. Had the milk moved in ordinary freight service all the way from the Borden plant to the Illinois Central station, it would have taken about 48 hours per shipment. The entire switching operation which was performed by the Milwaukee took about two hours.

Each of the bills of lading which the parties have agreed are representative of all of the shipments at issue carries the following notation on its face:

"Passenger train service requested.

"If freight service accorded in full or in part, designate on freight bill rendered to Finance Officer, complete class of service rendered from origin to destination."

Each bill also carries one or the other of the following notations on its face:

"Intermediate from Clinton Jct Wis.

"WTL 375D ICC A 3517

"This shipment tendered for transportation under WTL Tariff 375–C using intermediate application from Clinton Junction, Wis., as provided in Item 20 with all intermediate switching or transfer service included in rate rather than under C.P.A.—M. & C. Tariff No. 4 to avoid an indefinite or excessive switching charge at Chicago."

Plaintiff's billings for the 1943 and 1944 shipments were based on the rates in WTL Tariff No. 375–C without land-grant deductions, and defendant paid them on that basis. In 1946 the General Accounting Office requested refunds based on the application of land-grant deductions. Plaintiff recognized the validity of this determination and made the refunds. In 1948, however, plaintiff filed bills reclaiming a part of the refunds. During the consideration of these bills, the General Accounting Office determined that the rates in WTL Tariff No. 375–C did not apply, and it issued an additional claim for overpayments predicated on the application of the rates in Central Passenger Association (CPA), Joint Tariffs Milk & Cream (M. & C.) Nos. 4 and 6 with land-grant deductions. Plaintiff refused to refund the alleged overpayments and defendant made deductions from other bills due plaintiff in October 1951 and February and March, 1952.

On the 1946 shipments there were similar developments. In 1949 the General Accounting Office applied CPA Joint Tariffs M. & C. Nos. 4 and 6, and when plaintiff refused to refund the amounts claimed, the defendant deducted the amounts from other bills due the plaintiff in May 1951. The plaintiff's share of the payments made by the defendant for the shipments at issue, after the de-

ductions had been made on the basis of the application of CPA Joint Tariffs M. & C. Nos. 4 and 6, aggregated not less than $4.83 nor more than $9.53 per car.

The parties have agreed that if plaintiff prevails in its contention that the applicable rates for the shipments are found in WTL Tariff No. 375–C, plaintiff is due the amount of $10,529.09. If the defendant prevails in its contention that the applicable rates for the shipments are found in CPA Joint Tariffs M. & C. Nos. 4 and 6, defendant is due the amount of $435.06. The defendant has also asserted that the statute of limitations bars plaintiff's recovery of the full amount claimed, in any event. If this theory is correct, the amount of plaintiff's recovery would be limited to $5,943.42.

It is a well recognized principle of transportation law that agents of the United States are authorized to contract for shipments with common carriers only at rates which do not exceed those offered to the public by published tariff. Missouri Pacific Railroad Co. v. United States, 1931, 71 Ct.Cl. 650, 661. Therefore, if the rates in CPA Joint Tariffs M. & C. Nos. 4 and 6 are applicable and if they are less than the rates contended for by plaintiff, they must control. Both conditions, of course, must be satisfied. On the other hand, the defendant concedes that if CPA Joint Tariffs M. & C. Nos. 4 and 6 do not apply, then plaintiff's theory of the case, under WTL Tariff No. 375–C, must prevail.

The defendant's contention that CPA Joint Tariffs M. & C. Nos. 4 and 6 set the rates for the movements is advanced on the theory that the movements were freight traffic in passenger train service, and that no special services were furnished by plaintiff in handling this freight. Plaintiff, however, in advocating WTL Tariff No. 375–C, maintains that the movements were freight moving in passenger service and that the services performed were special passenger switching services. A third type of service, in contrast to the theory of either party would be freight moving in purely freight service.

It must be noted at first that special services were requested by the defendant and furnished by the plaintiff. The purpose of the May 1943 inquiry made by defendant was to satisfy itself that the Milwaukee could move the milk cars in such a way as to meet the scheduled daily departures from Chicago. The purpose for which the notations were placed on the bills of lading was to insure that expedited service would be given. Unless the movements had been expedited it would have taken two days instead of two hours to move the fresh, whole milk to a point from which it could be forwarded to its ultimate consumers. Furthermore, it has been shown that special switching services were provided both by the Healy patrol and by the passenger switching crew that took over the cars at Pacific Junction.

But it was a special service in another sense, too. The plaintiff voluntarily agreed not to exercise a right which it would have had under either of the tariffs before us. Both provided that the carrier had the right to restrict shipments thereunder to trains which it designated. In meeting the schedule set up by the defendant, the plaintiff relinquished this right and thereby furnished a special service.

We do not think that it is a particularly compelling argument that the plaintiff will have paid more for the use of the connecting passenger tracks than it will receive in payments if defendant's theory prevails. It appears that the agreements made among the carriers in the Chicago Terminal area as to trackage charges were made for their mutual and general benefit and without particular attention to the costs and revenues involved in particular movements. If the tariff advanced by defendant applies, it must apply irrespective of the fact that plaintiff may suffer a loss as a result of its agreements and understandings with its connecting carriers.

But the discrepancy between trackage expenses and possible revenues is signifi-

cant for the indications it gives as to what plaintiff intended and understood. Plaintiff must have felt that it was offering special services within the framework of the suggested tariff, otherwise it would not have proceeded to pay the trackage charges out of its own revenues when it had the option to refuse, and to move the milk over freight tracks to meet trains of its own choosing. The defendant in suggesting an applicable tariff believed that special services were called for because of the manner in which it specified and requested that expedited service be performed. It is difficult to believe that plaintiff would have rendered expedited service, which it could have refused to do under the tariff, if it understood that it was doing so under the tariff now advanced by defendant and would, in effect, not only earn nothing on the operation, but pay for the privilege of performing the service. As this court said in Greyhound Corporation v. United States, 111 F.Supp. 259, 264, 124 Ct.Cl. 758, 767, "[t]o support the defendant's contentions would result in inflicting on the plaintiff a contract which, if it had been afforded the opportunity, it would have rejected."

As to the application of CPA Joint Tariffs M. & C. Nos. 4 and 6, those rates apply only from designated stations. Healy, Illinois is not one of those stations nor is it located in the passenger switching area of Chicago. Furthermore, the tariffs do not list the Milwaukee as a participating carrier. On the surface, then, this would seem to deny the applicability of these tariffs. The defendant finds an exception to this, however, which will be discussed later. There are other reasons, also, which cast doubt on the applicability of CPA Joint Tariffs M. & C. Nos. 4 and 6 to the shipments in question.

We cannot agree with the implication which the defendant draws from characterizing these shipments as freight traffic in passenger train service. Rather, we must agree with plaintiff that the emphasis is on the character of the service more so than on the character of the material moved. Defendant asked for and received the same service in the switching of its milk into the Illinois Central station as would have been accorded passenger traffic. This was the defendant's primary intention since it felt it was necessary to move the fresh milk from the dairy in a much shorter time than would have been possible had it been handled as ordinary freight. Plaintiff emphasizes the service given, then, while defendant emphasizes that the milk was freight. Freight is moved by carriers in both freight and passenger service and, of course, different rates obtain for each service.

The Government argues that CPA Joint Tariffs M. & C. Nos. 4 and 6 incorporate certain other tariffs making the whole structure applicable to these shipments, notwithstanding the fact of the omission of Healy and the Milwaukee from M. & C. Tariffs Nos. 4 and 6. The tariffs referred to, however, are purely freight tariffs; that is, they pertain to freight which is moved only in freight service. They would not, as we have already seen, be applicable, therefore, to commodities which were moved in passenger service. In attempting to apply these tariffs, defendant ignores the fact that passenger service was afforded these shipments and concentrates on the fact that Healy is within the Chicago Terminal Area. Healy is not, however, within the Chicago passenger switching area, so these shipments in passenger service must be considered a special service.

The tariff contended for by defendant is patently inapplicable to the shipments in question becaue Healy is not a listed station and because the Milwaukee is not a participant. The freight tariffs which the Government says are incorporated are not appropriate because the character of the special services requested and performed is inconsistent with the purely freight tariffs. Therefore, the rates in WTL tariff No. 375–C are applicable to the disputed shipments.

We pass now to the question of whether or not any part of the amount claimed by the plaintiff may not be recovered be-

cause more than six years expired between the commencement of the cause of action and the initiation of suit in this court. The defendant's position is that the plaintiff had a cause of action against the Government for as much of the amounts refunded as it believed had been refunded in error, and that this cause of action arose in 1946 at the time of the refund. The Government thereupon concludes that the period of limitations expired in 1952. As evidence of this cause of action for an amount equal to the total refund, which the Government says that the plaintiff had in 1946, attention is called to a claim made in 1948 by plaintiff for a return of part of the refund.

Plaintiff's position is that its cause of action first accrued in 1951 when the defendant first made deductions from current billings in an amount equal to the difference between the rates paid under WTL Tariff No. 375–C and the rates claimed by defendant under CPA Joint Tariffs M. & C. Nos. 4 and 6. The defendant insists that recovery on any cause of action which arose in 1952 must be limited to the sums collected during that year.

We cannot accept the theory proposed by the defendant. The operative facts which gave rise to this suit were defendant's insistence that a lower tariff structure be applied to the shipments than the one on which payment had been made, and its action in withholding the amounts from charges then owed the plaintiff. It seems to us that there was an open account on the books of the defendant where debits and credits were entered from time to time as events required. At any rate, this appears to be the manner in which the Government treated these transactions. In 1951 and 1952, it offset amounts it felt had been erroneously collected back in 1946 against debts which had absolutely no relation to the original transactions. In Gulf Oil Corporation v. United States, Ct.Cl. 163 F.Supp. 374, 376, a plaintiff who could have maintained suit against the Government in 1947 accepted a voluntary repayment of part of the amount claimed

in 1953. The suit for the balance was commenced in 1957 and this court held that it was barred by the statute of limitations. In answering the plaintiff's contention that the cause of action had not arisen until 1953 when the defendant credited plaintiff with the full amount before refunding a part of it, this court said, at page 3 of the slip opinion:

"If the Government had in 1953 for the first time sought to make an offset for desirable features against some indebtedness which it owed to the plaintiff there would be merit in plaintiff's argument."

Here the Government takes a position analogous to that of plaintiff in Gulf Oil and insists that the refunds and the deductions create separate causes of action. In this case an offset such as described by the court was made by the Government in 1951 and 1952. Surely plaintiff had no cause of action in 1946 for the recovery of amounts withheld in 1951 and 1952. The railroad could not have known at that time what was to be the Government's ultimate theory of the applicable rate. The record does not indicate what were the grounds for plaintiff's reclaiming a part of the 1946 refund. We must assume, certainly, that it was not based on principles and actions which did not come into being until some years later. Moreover, the defendant's argument that "as evidence of the fact that the carriers believed the *total* refund was in error, a supplemental bill was filed in June of 1948 reclaiming *part* of the amount refunded" appears to be illogical. It seems to us that if plaintiff believed that it was entitled to reclaim the total land-grant refund for whatever the reason, it would not have reclaimed only a part of it.

It is our conviction that Western Trunk Line Tariff No. 375–C is applicable to all of the shipments which are the subject of this suit. The plaintiff's cause of action first accrued no sooner than the deductions made by defendant in 1951 and its petition is timely as to all amounts claimed.

The plaintiff is entitled to have judgment entered in the amount of $10,529.09.

**844**

The defendant's counterclaim will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.

MADDEN, Judge, took no part in the consideration and decision of this case.