Dureee, Judge,
dissenting:
I respectfully dissent from the adoption per curiam of the Commissioner’s Opinion and Findings.
The commodity shipped was the projectile-less, propelling charge portion of a round of service ammunition for the 120 mm. (4.7 inch) M-l anti-aircraft gun. It consisted of 24 pounds of smokeless powder and a primer in an M-24 brass cartridge case. This propelling charge is one component of a complete round of ammunition which also includes the fuse, the primer, and the forged steel projectile containing from 4.8 to 5.42 pounds of high explosive. It was shipped separately from the projectile.
Plaintiff contends that the propelling charge should be classified for shipment as “smokeless powder for cannon” under a Class 1 rating. Because the propelling charge is not specifically listed in any freight commodity classification, plaintiff proposes that it should be considered as a combina *247 tion of “smokeless powder for camion” (Class 1 rating) and a “metal cartridge case” (Class 3 rating), and that the Class 1 rating for “smokeless powder” should apply by virtue of Rule 18 of (Consolidated Freight Classification) C.F.C. No. 16 (December 6, 1943), which provides:
When not specifically classified, articles which have been combined or attached to each other, will be charged at the rating for the highest classed article of the combination, and on shipments subject to CL [carload] rating the minimum weight will be the highest minimum weight provided for such highest rate or rating.
The court has accepted defendant’s contention that the propelling charge should be classified as “Cartridges, cannon, blank” for two categories of the shipments, and as “fixed ammunition” for the two other categories. Consequently, the court finds that a classification of “Cartridges, cannon, blank, loose or in packages” at a Class 4 rating is correct under C.F.C. No. 16 — Item 1835 for two of the categories. For the two other categories, the court applies the commodity rate applicable to “fixed ammunition” in accordance with either TCFBT. 4, Item 1606 or TCFBT-4-V for “Ammunition Explosive (subject to Item 832) Ammunition, fixed, for cannon with empty, sand loaded or solid projectile, or without projectile” The court, in adopting the Commissioner’s opinion, has recognized that “from a strictly ordnance viewpoint, the ammunition is neither blank nor fixed” but has concluded that this is not determinative of the classification for transportation purposes. Thereupon, by means of a labyrinthian historical analysis of tariffs, the court has held that for transportation purposes, brass cartridges containing charges of smokeless powder for projecting antiaircraft projectiles from 120 mm. cannon, but without projectiles, are “blank ammunition”, and that they are also “ammunition, -fixed, for cannon, with empty, sand loaded or solid projectiles, or without projectiles.” (Emphasis supplied.)[1]
*248 The basis for holding that this propelling charge is “fixed ammunition,” is quite tenuous. Under World War II ordnance terminology, the service round for the 120 mm. antiaircraft cannon was not known as “fixed ammunition”, but as “separated ammunition.” To be “fixed ammunition”, it would have had to be comprised of “a cartridge case (which contained the propellant) whose base contains the primer, and whose forward opening is crimped to the projectile so that the entire round is integral, and all components are loaded into the weapon in one operation.” See War Department Technical Manual TM 9-1904, “Ammunition Inspection Guide” (March 2, 1944). In this War Department Manual, the propelling charge was listed as a component part of “Separate-loading Ammunition” which was shipped and loaded separate from the projectile.
As the majority opinion states, the definition of “fixed ammunition” in the War Department Manual, ibid., which was in effect when these shipments were made in 1944-1945, was changed by Technical Manual TM 9-1901 (September 1950). In the 1950 manual, the distinguishing characteristic of “fixed ammunition” was the non-adjustability of the propelling charge. However, in 1956, the distinguishing characteristic of “fixed ammunition” again became the integration of the projectile and cartridge, as it was in 1944-1945. See Departments of the Army and Air Force Technical Manual TM 9-1900 and Technical Order TO 11A-1-20 (June 1, 1956).
As to the expert testimony offered, the majority opinion states:
“Considering the foregoing, it is not difficult to understand why both ordnance experts, Dr. Lewis and Mr. Herczogh, differed as to the meaning of ‘fixed’ ammunition. It would appear that both men are correct, depending, of course, upon the technical manual each relied. The shipments in question occurred during the years 1944 and 1945; therefore, the definition of ‘fixed' ammunition set forth in TM 9-1904., dated March 2, 1944, which was in force dwing those years, rrmst prevail. This is not to say, however, that with respect to freight classification, the term ‘fixed’ ammunition, as used in the CFC’s, conveys the meaning plaintiff pro *249 poses. A tariff must be given a fair reading, and any unreasonable ambiguities cannot be imparted.” (Emphasis supplied — citations omitted.)
One might reasonably conclude that the 1950 definition of “fixed ammunition” (based on the non-adjustability of the propelling charge) was changed in 1956 to return to the 1944 definition (based on the integration of the projectile and cartridge) to resolve an unreasonable ambiguity in the 1950 definition. Nevertheless, the majority has stated that:
“ * * * It is reasonably clear from the record that the term ‘fixed ammunition’, when applied to the transportation characteristics of the commodity involved, means that the propelling charge therein is non-adjustable, and that ammunition for cannon (wherein the propelling charge is non-adjustdble) with or without projectile, historically has been described for transportation charges as ‘fixed ammunition.’ ” (Emphasis supplied.)
Although the majority opinion does contain some historical analysis to support its conclusion that “cartridge, cannon, blank”, for the purposes of freight classification, means the same thing as “ammunition for cannon * * * without projectile,” there does not appear to be any historical basis in either ordnance or transportation terminology to find that “fixed ammunition” is also “ammunition explosive for cannon, * * * without projectile.” In the absence of clear historical evidence to the contrary, I would conclude that “fixed ammunition” means what the 1944 Technical Manual, supra, said that it meant.
I must also respectfully disagree with the holding of the majority that 120 mm. cartridges, containing 24 pounds of explosive smokeless powder and designed to propel an explosive anti-aircraft shell to altitudes of 30,000 feet, are “blank cartridges for cannon,” for the purpose of tariff classification. “Blank cartridges” in military terminology are cartridges loaded with black powder, not smokeless powder, and are used solely for simulated artillery fire or ceremonial salutes. See War Department Technical Manual TM 9-1901 (June 29, 1944).
The majority opinion cites the historical development of Tariff Item 1835 of CFO No. 16 from 1919 to 1931, a period *250 when tli© ancestor items initially provided ratings on “ammunition, explosive, for cannon without projectile (blank cartridge, metal)” and finally in July of 1931, provided ratings on “ammunition, explosive, for cannon; cartridges, cannon, blank.” From this, and solely from this, the majority concludes that in transportation terminology “ammunition for cannon without projectile” is synonymous with “cartridges, camion, blank”, and accordingly, applies the class rating on “cartridges, cannon, blank” to the commodity shipped. The fallacy in this linguistical equation is that the term “cartridges, cannon, blank” was not used in these ancestor tariff items to describe all types of ammunition for cannon without projectiles, especially not a novel type of anti-aircraft ammunition which did not come hito use until World War II.
“Cartridges, cannon, blank” are assigned a Class 4 rating under Item 1835 of the tariff, whereas “cartridge cases (cartridge shells) cannon, empty” are given a higher Class 3 rating. It is difficult to conceive how, under transportation rate terminology, a cartridge case for cannon filled with high explosive smokeless powder would be given a lower rating (4) than the empty cartridge case (3). Even though the carload minimum for blank cartridge shells under the Class 4 rating is 36,000 pounds and the carload minimum for empty cartridge shells is only 30,000, this fact can hardly explain the apparent anomaly in this case since the average minimum shipment was over 68,000 pounds and the smallest weight for one shipment was 56,535 pounds.
The majority concluded that “from a strictly ordnance standpoint, the ammunition is neither ‘blank’ nor ‘fixed’; but for the reasons previously mentioned and hereinafter discussed, the ordnance meaning is not controlling. In short, although the commodity is neither ‘blank’ nor ‘fixed’ ordnance, it does not follow that the identity of the commodity from a military ordnance standpoint is determinative of its classification for transportation purposes.”
Even if this distinction between ordnance and transportation terminology is accepted, I can find no basis from the detailed historical development of the tariffs to establish that “fixed ammunition” in ordnance terminology was not *251 “fixed ammunition” in transportation terminology or that “blank cartridges” in ordnance language were not “blank cartridges” in transportation language.
Both the courts and the Interstate Commerce Commission have consistently recognized that the terms used in-tariffs, unless specially defined, must be given their ordinary commercial meaning as ordinarily understood in the particular trade or industry. Union Wire Rope Corporation v. Atchison, Topeka & Santa Fe Railway Co., 66 F. 2d 965 (8th Cir. 1933), cert. denied, 390 U.S. 686; Floe v. Cedergreen Frozen Park Corporation, 37 Wash. 2d 886, 226 P. 2d 871 (1951); DeRamus v. Mengel Co., 74 F. Supp. 425 (W. D. Ky. 1947); Brasco Manufacturing Co. v. Chesapeake & Ohio Railway Co., 229 I.C.C. 533 (1938); Spencer Sons Co. v. Cincinnati, N. O. & T. P. Ry. Co., 163 I.C.C. 492 (1930) ; Chippewa Falls Woolen Mill Co. v. Minneapolis, St. Paul & Sault Ste. Marie R. Co., 231 I.C.C. 413 (1939); Titanium Alloy Manufacturing Co. v. Atchison, Topeka Ab Santa Fe Railway Co., 259 I.C.C. 121 (1944).
The only special definition of “fixed ammunition” that was applicable at the time these shipments were made is contained in Technical Manual TM-9-1904, supra. Under the classification of “fixed”, “semi-fixed”, or “separate loading”, fixed ammunition is defined as follows:
A complete round of blank ammunition consists of a black powder charge contained in either a loose-fitting cloth bag which sags around the primer or in one or two compressed cylindrical pellets wrapped in cellophane fitting around the primer, assembled in a brass cartridge case. * * * (Emphasis supplied.)
The only special definition of “blank ammunition” in effect at the time these shipments were made is in Technical Manual, TM 9-1901, supra. Blank ammunition is described as being used for practice maneuvers, simulated fire and ceremonial purposes, and is not used in conjunction with any projectile. A complete round of “blank ammunition” is defined in the Manual as follows:
Fixed Ammunition. This type comprises a cartridge case (which contains the propellant) whose base contains the primer, and whose forward opening is crimped to the projectile so that the entire round is integral and *252 all components are loaded into the weapon in one operation.[2]
Not only has the Interstate Commerce Commission relied upon ordnance terminology in the interpretation of tariff language, but also the Government has urged this. In Pennsylvania Railroad Company v. United States, 165 Ct. Cl. 1 (1964), this court considered a ruling of the Interstate Commerce Commission that “ammunition for cannon with explosive projectiles fixed or semi-fixed,” although conceded to be “ammunition for cannon” as described in the class rating, was covered by the lower commodity tariff rate item of “Explosive, cartridges, loaded.” The record before us in that case demonstrated that the Commission, in reaching its conclusion, relied completely upon expert opinion and reasons based upon ordnance terminology and technical ordnance manuals to the effect that the ammunition for cannon involved conformed to the basis and accepted requirements of the more specific term “cartridge.”
Accordingly, I differ with the conclusion of the majority that “although the commodity is neither ‘blank’ nor ‘fixed’ ordnance, it does not follow that the identity of the commodity from a military ordnance standpoint is determinative of its classification for transportation purposes,” particularly since we have no specific definition of either “blank” or “fixed” ammunition from a transportation standpoint. Since the commodity shipped cannot be rated under Class 4 as “cartridges, cannon, blank” or as “fixed ammunition” under the tariffs cited, it should be rated under the classification urged by plaintiff, under E,ule 18 at CFC No. 16, supra, and become subject to the highest-rated article of the combination — namely, the first-class rating for smokeless powder.
If we were to accept ordnance terminology or even common usage as a standard, neither the shipper nor the Government nor this court would in the future have to resort to a standard of tariff interpretation which requires threading one’s way through the intricate convolutions of the maze of *253 rate classifications in order to determine that, historically, in transportation parlance, “fixed ammunition” is not “fixed ammunition” and that “blank cartridges” are not “blank cartridges.”
CoeliNS, Judge, joins in the foregoing dissenting opinion.
Findings oe Fact
1. Plaintiff is a corporation organized and existing under the laws of the State of Minnesota, and is a common carrier by railroad in interstate commerce over its own lines and jointly with other lines.

Shipments

2. During the years 1944 and 1945, plaintiff, over its own lines and jointly with other carriers, performed transportation services for defendant by carrying 49 shipments of freight, all of which moved between points within the United States under Government bills of lading.[1] The shipments originated at Tulalip, Washington; Avondale, Colorado; Ordnance, Oregon; Parsons, Kansas; and Watson, Indiana; and were consigned to Mukilteo, or Tulalip, Washington. Plaintiff, as delivering carrier, made delivery of all of the shipments involved to an officer or agent of the defendant authorized to receive them.
Charges, Payments, and Deductions
3. (a) Upon completion of the transportation services involved herein, plaintiff, as the final and delivering carrier, billed the transportation charges to defendant in accordance with certain tariffs and rate authorities, mentioned hereinafter. The charges so billed were paid by defendant. Thereafter, plaintiff received notices from defendant stating that overpayments of said bills had been determined by the General Accounting Office and refunds were demanded. No refunds were made by plaintiff, and defendant, commencing on *254 July 7, 1959, and concluding on November 1, 1961, made various deductions from amounts due plaintiff for other transportation services performed by it.
(b) Subsequently, on July 24, 1962, plaintiff filed its petition herein, claiming entitlement to the sum of $16,226.58,[2] as a result of said deductions made by defendant.
(c) In its answer to plaintiff’s petition, defendant alleged, as a second affirmative defense, that certain claims made by plaintiff, in whole or in part, arose more than sis years prior to the filing of the petition; and that, therefore, such claims are barred by the statute of limitations, 28 U.S.C. 2501.[3] Defendant also alleged a counterclaim against plaintiff for $4,857.02, allegedly representing the amount paid to plaintiff over and above the amount lawfully due it for the transportation services performed. (See footnote 2, supra, and finding 31, infra.)

Categories of Shipments

4. The parties have stipulated that for purposes of this case, the 49 shipments may be divided into five categories as follows:
a. Category 1 consists of those shipments originating at Tulalip, Washington, destined to Mukilteo, Washington, and covered by plaintiff’s bill numbers[4] G-74103, G-74104, and G-74558.
b. Category 2 consists of those shipments originating at Avondale, Colorado, consigned to Tulalip, Wash *255 ington, and covered by plaintiff’s bill numbers G-76900, G-77409, and G-74274.
c. Category 3 consists of those shipments originating at Ordnance, Oregon, destined to Tulalip, Washington, and covered by plaintiff’s bill number G-88694.
d. Category 4 consists of those shipments originating at Parsons, Kansas, and Watson, Indiana, consigned to MuMlteo, Washington, and covered by plaintiff’s bill numbers G-95068, G-95070, and G-95349.
e. Category 5 consists of one shipment consigned from Parsons, Kansas, stored in transit at Panhandle, Nebraska, shipped to Tulalip, Washington, and covered by Government Bill of Lading Number WW-2919345 on which the commodity shipped is described as “Explosive Projectiles.”
5. With respect to shipments embraced within Category 1, plaintiff contends that the rates named in Trans-continental Freight Bureau (TCFB) Section 22, Quotation 13 Series, are applicable. Defendant contends that lower freight rates are applicable and bases its claim for this category of shipments upon a rating of Class 4 published in Item 1835 of Consolidated Freight Classification (CFC) No. 16, issued October 25, 1943, effective December 6, 1943.
6. With respect to shipments embraced within Category 2, plaintiff contends that the applicable rate must be based upon Item 135 of Trans-continental Freight Bureau Tariff 38-F. Defendant contends that this category of shipment is entitled to lower freight charges and bases its claim upon a combination of rates over Seattle and Everett, Washington, made up of a commodity rate for Item 1606 of TCFB Tariff 4-U from Avondale, Colorado, to Seattle and Everett, and Class 4 as provided in Item 1835 of Consolidated Freight Classification No. 16.
7. With respect to the shipments embraced in Category 3, plaintiff bases its charges upon a rate named in Transcontinental Freight Bureau Section 22, Quotation 13-A, without land grant deduction, or, in the alternative, upon Item 16410 of Consolidated Freight Classification No. 16, with land grant deduction. Defendant bases its claim to lower freight charges for this category of shipments upon Item 1835 of CFC No. 16 naming a Class 4 rating.
*256 8. With respect to the shipments embraced in Category 4, plaintiff bases its charges upon a rate named in Transcontinental Freight Bureau Tariff No. 38-G, or, in the alternative, Item 16410 of Consolidated Freight Classification No. 16. Defendant contends that lower rates are applicable and constructs a lower basis of charges by a combination of rates from origin to Panhandle, Nebraska, a Class 4 rating named in Item 1835 of CFC No. 16; from Panhandle to Everett, Washington, a commodity rate named in Item 3200 of TOFB Tariff No. 4-V; and beyond Everett, a Class 4 rating named in Item 1835 of CFC No. 16.
9. There is no dispute with respect to the rate and amount due for the shipment of “Explosive Projectiles” embraced in Category 5. The parties have agreed and stipulated that plaintiff is entitled to recover $1,314.44 on this shipment in any event.

Descriptions on Bills of Lading

10. With the exception of the Category 5 shipment (mentioned in findings 4(e) and 9, supra) all of the shipments, i.e., the 48 shipments in dispute here, were described on the bills of lading therefor as so many “Bxs. Smokeless Powder For Cannon.” Additionally, the bills of lading contained a supplementary description in various ways as follows:
(a) P5ULA (for 120 MM Gun Ml (anti-aircraft) Chg. Prop. — in Case Cart., M24.
P5UEA— (4.7 In. Gun Ml Chge Prop).
P5ULA — (120 MM gun Ml AA Chge Prop).
P5ULA — (4.7 In. Gun Ml).
(120 MM Gun Ml AA Chge Prop) (P5ULA).
(f) (For 120 MM Gun Ml (anti-aircraft) Chg. Prop.— In Case Cart M24) (P5TJEA).
(4.7 In. Gun Ml Chge Prop) (P5ULA).
(1144 EDS P5TJLA 4.7 In Gun Ml CHG Propelling). (h)
Charge, Propelling (In Case, Cartridge, M24), (120-MM Gun). (i)
(Charge Propelling 120 MM GUN) (P5ULA). (Í)

Tariffs

11.(a) At the times of the shipments involved herein, Trans-Continental Freight Bureau (TCFB), Section 22,
*257 Quotation 13-A Series (mentioned in findings 5 and 7, rnpra), provided in pertinent part:

Item No. 1. Traffic Covered

The traffic covered by and subject to this quotation is the commodities listed in Item No. 2 when originating at and consigned to points within Mountain Pacific and Pacific Coast territory other than covered by Mr. A. F. Cleveland’s Section 22 Quotation No. 14 — A of December 7, 1942 and amendments thereto.

Item No. ¡2. List of Commodities

Ammunition, explosive, incendiary or gas, smoke or tear producing, viz.:
Ammunition, fixed or semi-fixed, for cannon;
Bangalore Torpedoes;
Bombs, Mines or Depth Charges;
Boosters, Bursters, Detonating Fuzes or Detonators;
Cartridge Cases, Cannon, empty pruned;
Fuzes, combination, percussion, tracer, time or mine;
Grenades, hand or rifle;
Percussion Caps;
Primers;
Projectiles;
War Heads;
Gases, poison;
Grenades, hand or rifle, practice;
Torpedoes, aircraft or submarine, without explosives, self-propelling.
Explosives, viz.:
Caps, blasting or electric blasting;
High Explosives, noibn herein;
Low Explosives, including black powder; Nitro-cellulose, dry;
Nitro-starch, dry;
Picric Acid;
Safety Squibs;
Smokeless Powder;
Tri-Nitrotoluol;
Wet Fulminate of Mercury.
Military Pyrotechnics or fireworks.

Item No. 3. Rates To Be Applied

_ Subject to compliance with all the terms and conditions of this quotation on each carload shipment of the kind referred to in Item No. 2, the railroads will apply rates as shown m Exhibit “A” attached hereto, subject to minimum weight of 50,000 pounds.

*258
Item No. J¡.. Routing and Circuity Limitations

The rates as provided herein apply to short-line mileage via routes authorized in current class rate tariffs and subject to all circuity and other restrictions applicable to such class rate tariffs.

Item No. 5. Lam,d-Gra/nt Ded/actions

No rate or charge applicable on any shipment moving under this quotation shall be subject to any land-grant deduction.

Item No. 6. Charges and Allowances

Shipments made under this quotation are subject to all charges and all allowances for or in respect of diversion, reconsignment, arbitraries, demurrage, inspection, switching, and to all other privileges, charges and rules which in any way increase or decrease the amount to be paid on any shipment or which increase or decrease the value of the service, without, in any case, any land-grant deduction.
(b) Item 135 of TCFB Tariff 38-F (mentioned in finding 6, supra), provided a first class rating and carload rate on “Powder, Black, Brown or Smokeless, in 'boxes or kegs” in carloads.
(c) TCFB Tariff No. 38-G (mentioned in finding 8, supra) , provided a first class rate on “Powder, Smokeless, for cannon, as described in Item 16410 of Western Classification” of CFC No. 16. (See (g), infra.)
(d) Item 1606 of TCFB Tariff 4r-U (mentioned in finding 6, supra) provided a commodity rate for the following articles: “Ammunition: Explosive (Subject to Item 832) : Ammunition, fixed, for camion, with empty, sand loaded or solid projectiles or without projectiles.”
(e) Item 3200 of TCFB Tariff 4 — V (mentioned in finding 8, supra), provided a commodity rate as follows: “Ammunition: Explosive (subject to Item 832), viz: Ammunition, fixed, for cannon, with empty, sand loaded or solid projectiles or without projectiles.”
(f) Consolidated Freight Classification No. 16, issued October 25, 1943, effective December 6, 1943, (mentioned in findings 5 through 8, supra), provided under the heading “Ammunition, Explosive, Incendiary, or Gas, Smoke or Tear Producing”, in pertinent part:

*259

(g) Item 16410 of CFC No. 16 (mentioned in findings 7 and 8, supra), provided carload class rates as follows:

Commodity Transported

12. There is no dispute that the commodity shipped was the propelling charge portion of the round of ammunition for the 120-mm (4.7 inch) antiaircraft gun Ml, without a projectile, consisting of 24 pounds of smokeless powder contained in the M24 cartridge case. It is not a complete round of ammunition for said weapon, but rather a component part of a complete round therefor. A complete round consists of the projectile, the propelling charge (contained in the cartridge case), the fuse, and the primer. The antiaircraft projectile, i.e., the M73 shell, which the commodity shipped is designed and intended to propel to target, is filled with the M61 mechanical time fuse which is standard with said shell. The projectile body is of forged steel designed to hold 5.26 pounds of TNT, 4.8 pounds of 50/50 amatol or 5.42 pounds of trimonite as a bursting charge. The projectile also uses the M20A1 booster as part of the high explosive bursting *260 charge. It should be made clear that the M73 explosive projectile was not included in the shipments involved in the instant case. Only the cartridge cases (with the propellant and primer) were the items shipped.
13. Plaintiff contends that the commodity shipped should be classified for transportation purposes as “smokeless powder for cannon” and rated as Class 1. The basis for this contention is that the propelling charge for 120-mm cannon is not specifically listed in either the Consolidated Freight Classification No. 16 or the Trans-continental Freight Bureau Tariffs 4-U or 4-V, supra, which defendant maintains are applicable; that the commodity then is a combination of smokeless powder (which bears a Class 1 rating) and a metal cartridge case (which bears a Class 3 rating); and that, therefore, the rating for smokeless powder applies by virtue of Rule 18 of CFC 16, Combination Articles, effective December 6,1943, which reads as follows:
When not specifically classified, articles which have been combined or attached to each other, will be charged at the rating for the highest classed article of the combination, and on shipments subject to CD [carload.] rating the minimum weight will be the highest minimum weight provided for such highest rate or rating.
14. Defendant contends that for the shipments in Categories 1 and 3 (finding 4(a) and (c), supra), the commodity shipped should be classified as “Cartridges, cannon, blank”; and with respect to shipments in Categories 2 and 4 (finding 4(b) and (d), supra), as “fixed ammunition” where applicable. Consistent with the foregoing, defendant applied rates applicable to Tolanh cartridges, in accordance with Item 1835 of Consolidated Freight Classification No. 16 (see finding 11 (f), supra), or where commodity rates apply, the rates applicable to -fixed ammumtion, in accordance with Transcontinental Freight Bureau Tariffs 4-U and 4-V (see finding 11 (d) and (e), respectively, supra).

Military Ord/ncmce Definitions

15. (a) In War Department Technical Manual, TM 9-1901, entitled “Artillery Ammunition”, dated June 29, *261 1944, artillery ammunition is classified according to use as “service, practice, blank or drill.” Service ammunition is fired for effect in combat. Blank ammunition, which, is provided in small and medium calibers up to and including 105-mm, is used for such purposes as practice in maneuvers, simulated fire, firing the morning and evening gun, and saluting, and has no projectile.
(b) A complete round of blank ammunition is defined in the above-identified technical manual as follows:
A complete round of blank ammunition consists of a black powder charge contained in either a loose-fitting cloth bag which sags around the primer or in one or two compressed cylindrical pellets wrapped in cellophane fitting around the primer, assembled in a brass cartridge case. * * *
(c) Webster’s New International Dictionary (1961 Ed., p. 230) defines blank cartridges as “a cartridge having in place of a projectile a wadding (as of paper) sealed in the mouth of the case.”
16. A later Department of the Army Technical Manual, TM 9-1900, entitled “Ammunition General,” dated June 1956, defines a complete round of blank ammunition as follows:
A complete round of blank ammunition consists of a cartridge case, primer, charge of black powder, and a closing cup sealed in the mouth of the case. The primer is fitted to the cartridge case as in fixed or semifixed rounds of service ammunition. The black powder charge ranges in weight from 0.87 to 2.0 pounds depending upon its caliber and type. The blank cartridge contains no projectile.
Charge. The black powder charge for blank rounds consists of loose potassium- or sodium nitrate-type black powder in sewed cotton cloth bags.
17. (a) War Department Technical Manual, TM 9-1904, entitled “Ammunition Inspection Guide,” dated March 2, 1944, states that ammunition is classified, according to the method of assembly for transportation and for loading into *262 the piece (gun), as “fixed”, “semifixed”, or “separate-loading” (unfixed). The various classifications are defined as follows:
Fixed Ammunition. This type comprises a cartridge case (which contains the propellant) whose, base contains the primer, and whose forward opening is crimped to the projectile so that the entire round is integral and all components are loaded into the weapon in one operation.
Semifixed Ammunition. This type differs from fixed ammunition in that, while the projectile and cartridge case are issued assembled and are loaded into the gun as a unit, the cartridge case is not permanently attached to the projectile, but may be removed at the firing point for the purpose of varying the amount of propelling charge as desired.
Separate-loading Ammunition. The distinguishing ■characteristic of separate-loading ammunition is that it requires two or more operations to be loaded into the breech of the gun. The propellant and primer are loaded separate from the projectile. The propellant is contained in either cartridge bags in definite quantities, or loosely in an uncrimpea cartridge case. In the former instance, the amount of propelling charge may be varied as desired. The primer is generally inserted after the breechblock has been closed.
(b) TM 9-1904 also states the following with respect to the propelling charge cartridge case for the ammunition used in the 120-mm antiaircraft gun (see finding 12, supra) :
The Brass Cartridge Case M24, weighs 24.70 pounds, ■and has an over-all length of 82.80 inches. It is fitted with a base rim to assist in extracting of the case after firing, and to trip the extractors in the breach so that the breechblock closes as the round is seated in the gun chamber. * * *
(c) The following is included in the list of Class B explosives in TM 9-1904 under the section entitled “Shipment of Explosives by Bail Freight”:
Ammunition for cannon with sand loaded projectile, solid projectile (AP [Armor piercing] shot), without projectile (blank).
*263 (d) A projectile is defined in TM 9-1904 as a “missile, either solid or with an explosive, chemical, or inert filler, propelled from a weapon by the force of gases produced by a propelling charge.” Projectiles may be solid or filled with high exposive, low explosive, or inert filler, or with chemicals.
(e) Agent W. S. Topping’s Freight Tariff No. 4, publishing Interstate Commerce Commission Kegulations for Transportation of Explosives and Other Dangerous Articles by (rail) Freight (including Specifications for Shipping Containers), effective January 7, 1941, under “class b — less daNGerous explosxves”, refers to “ammunition eor cannon WITH EMPTY, SAND-LOADED OR SOLID PROJECTILES OR WITHOUT projectiles”, which ammunition is defined as follows:
Ammunition for cannon with empty projectiles, sand-loaded projectiles, solid projectiles, or without projectiles, or shell, is fixed ammunition of caliber 37-mm (iy2 inches) and larger, assembled in a unit consisting of the cartridge case containing the propelling charge and primer and with empty, sand-loaded, or solid projectiles, or without projectiles.
(f)_ Ordnance Supply Catalog, dated June 10, 1944, identifies the Ammunition Inspection Code number “P5ULA” as follows:
PACKING AND SHIPPING DATA
For 120-mm Gun, Ml (Antiaircraft) Δ charge, propelling (in case, cartridge, M24), 120-mm gun, Ml P5ULA_ SMOKELESS POWDER EOR CANNON
(g)The Ordnance Supply Catalog of June 10,1944, contains an illustration identified as “Kepresentative marking of packing boxes for 120-mm gun, Ml ammunition,” which shows the marking required by ICC regulations as “ammunition EOR CANNON WITHOUT PROJECTILE.” [5]
*264 (h) Department of tlie Army Supply Catalog, entitled “Ammunition for Antiaircraft Artillery”, dated February 1951, reads in pertinent part:

(i) Joint Army and Air Force Commercial Traffic Bulletin No. 16, entitled “Freight Classification Guide”, dated February 13, 1950, provides that the freight nomenclature for “Charge, propelling (in case, cartridge, M24) 120-mm gun” is “Cartridge, cannon, blank.”
18. Department of the Army Technical Manual, TM 9-1901, entitled “Artillery Ammunition,” dated September 1950, states that, dependent on the manner in which these components (complete round of artillery ammunition) are assembled for firing, complete rounds of artillery ammunition are known as fixed, semifixed, separated, and separate-loading, which terms are described as follows:
In fixed amrmmition, the propelling charge is fixed that is, not adjustable, and the complete round is loaded into the weapon as a unit. As usually designed, the propelling charge is assembled loosely in the cartridge case which is crimped rigidly to the projectile. * * *
Semifixed amrmmition is characterized by an accessible propelling charge which may be adjusted for zone firing. Like fixed ammunition, it is loaded into the weapon as a unit. In this type of artillery ammunition, the cartridge case is a free fit over the projectile. The propelling charge is divided into sections, each containing propellant powder assembled in a bag. To adjust the charge, the projectile is removed from the cartridge case, the sections or increments not required are removed, and the projectile then is reassembled to the cartridge case. * * *
Separated amrmmition is characterized by the arrangement of the propelling charge and the projectile *265 for loading into the gun — the propelling charge, contained in a primed cartridge case, sealed with a closing-plug, and the projectile are loaded into the gun in one operation. * * * the mouth of the cartridge case does not fit over the base of the projectile as in fixed and semi-fixed ammunition, but * * * both propelling charge and projectile are loaded into the gun in one operation, not separately as in separate-loading ammunition.
In separate-loading ammunition, the separate components — projectile, propelling charge, and primer — are loaded into the weapon separately, Decause the ammunition is too heavy and bulky to be handled as a unit. Ammunition larger than 105-mm caliber falls into this category. First, the projectile is inserted into the breech and rammed home so that the rotating band seats in the forcing cone; second, the propelling charge (usually in one or more cylindrical cloth bags) is placed in the powder chamber immediately to the rear of the projectile; and, third, after the breechblock has been closed and locked behind the charge, the primer is inserted into the firing mechanism of the breechblock.

Expert Testimony

19. Both plaintiff and defendant presented expert testimony in an effort to identify, for transportation purposes, the commodity involved in the shipments here in controversy. The expert witnesses agreed that the commodity is not “blank ammunition” in the military sense, and the record supports such a conclusion. However, these witnesses expressed differing views as to whether the commodity involved constituted “fixed ammunition.”
20. Dr. Bernard Lewis, presently President of Combustion and Explosives Research Inc., Pittsburgh, Pennsylvania, testified as an expert witness on behalf of plaintiff. Dr. Lewis is a former Chief of Research and Development of Grenades and Mines, and also Deputy Chief of the Division of Research and Development of Artillery, Ammunition, and Artillery Fuses, Ordnance Department of the Army. Since 1940, he has been a member of the Scientific Advisory Committee of the Ballistic Research Laboratory for the Army Ordnance Department. Dr. Lewis has an excellent scholastic record and background, and he is eminently qualified in the ordnance field; but he has had no experience in the transportation of explosives.
*266 Dr. Lewis, in reliance on TM 9-1904, dated March 2, 1944 (finding 17(a), supra), expressed the opinion that whether ammunition is, or is not, -fixed depends upon the relationship between the propelling charge explosive train and the bursting charge explosive train, or, more simply, whether the propelling charge is assembled in a cartridge case which is fixed or permanently attached to the projectile. He considered ammunition for 120-mm cannon to be separated ammunition, i.e., the propellant is loaded into a brass cartridge case with a pre-set amount of propellant and closed by a plug which is not readily removable, thus rendering the amount of the propellant charge unadjustable. Considering the foregoing and the fact that the propellant charge in the ammunition for the 120-mm cannon is separated from the cartridge case, Dr. Lewis was of the opinion that such ammunition is not fixed.
Dr. Lewis admitted to the view that the definition of fumed amrmmition has taken on a somewhat different meaning over the years in that fixed ammunition now connotes that the propelling charge therein is not adjustable. But he was adamant in the opinion that there can be no such thing as -fixed ammunition without a projectile.
21. Mr. John Herczogh, Chief of the Safety Engineering Office, Office of Chief of Transportation, Department of the Army, which office arranges the hazard classifications for dangerous commodities for transportation purposes, testified as an expert witness on behalf of defendant. He has been with the Army for the past 26 years, during which period he has been employed with the Ordnance Department about one-half of the time and with the Transportation Corps the other half of the time. Mr. Herczogh is highly qualified from training and experience in both the ordnance and transportation fields.
Relying on TM 9-1901, dated September 1960 (finding 18, supra), Mr. Herczogh expressed the opinion that the character of the propelling charge as “non-adjustable” determines whether ammunition is “fixed” or not. He acknowledged agreement with Dr. Lewis that the commodity shipped was “separated” ammunition, but he concluded that *267 such ammunition was essentially “fixed” in nature because the charge therein could not he adjusted.
22. Neither Dr. Lewis nor Mr. Herczogh is incorrect, for it is apparent that as of March 2, 1944, the classification of ammunition as to type depended upon whether the projectile and propellant charge were issued ready for firing, i.e., in an integrated or complete component. (See finding 17(a), supra.) It is equally apparent that as of September 1950, whether ammunition was “fixed” was determined by the non-adjustability of the propelling charge. (See finding 18, supra.)
Based upon a review of the whole record, the following comparison of the types of ammunition as to similarity in characteristics shows that “separated” ammunition is similar to “fixed” ammunition in that the propelling charge is not adjustable,, and this undoubtedly contributed to the difference of opinion between Dr. Lewis and Mr. Herczogh:
Fixed Ammunition—
1) Cartridge case and projectile, permanently assembled.
2) Charge not adjustable.
Semifixed—
1) Cartridge case and projectile not permanently assembled.
2) Charge is adjustable.
Separate-loading—
1) Cartridge case and projectile are separated.
2) Charge can be adjusted depending on whether cartridge case is sealed.
Separated—
1) Cartridge case and projectile separated.
2) Charge not adjustable.
23. On the basis of the expert testimony presented at the trial and the whole record, it is clear, and may be helpful to a better understanding of the contentions of the parties to explain, that a complete round of service ammunition consists of two major components, namely, the “bursting charge explosive train” and the “propelling charge explosive train.”
The first above-named component consists of high explosives which detonate and produce shock. This “train” consists of a primer of black powder, which is initiated by a *268 firing pin, an igniter of black powder, and a propelling charge of smokeless powder. These elements are exploded in sequence to force the projectile from the weapon toward a target. As indicated in finding 12, supra, the bursting charge is not involved in the shipments in this suit.
The second above-named component consists of low explosives which burn very rapidly and produce pressure. This “train” is contained in the projectile, and consists of the firing pin and detonator in the artillery fuse, and the booster and bursting charge in the shell.
24. (a) It appears that smokeless powder has never been used in blank ammunition, nor was black powder used during World War II as the main propellant charge in rounds of artillery ammunition. The quantity of black powder used in blank ammunition (.87 to 2 pounds) was inadequate to propel a projectile from the weapon since it would not generate enough pressure for that purpose. Furthermore, black powder was not suitable for the main propelling charge because of its tendency to flash and absorb water. The manufacture of smokeless powder, on the other hand, was undertaken so as to minimize gun flash and water absorption. “Flashlessness” is desirable in order to prevent observation of artillery weapons in combat. Since blank ammunition is not used for firing weapons in combat, the flashless character of smokeless powder is not needed, hence black powder is used in blank ammunition.
(b) It should be kept in mind that while the cartridge cases that were shipped in the instant suit contained both black powder and smokeless powder, neither black powder nor smokeless powder, as such, was shipped.
25. Plaintiff places a great deal of emphasis on the identity of the commodity shipped from a strictly ordnance standpoint. While the record in the instant case will not support a finding that the commodity may be reasonably identified as “blank” or “fixed” orctncmoe, it does not follow that the identity of the commodity from a military ordnance standpoint is determinative of its classification for transportation purposes. In this connection, as noted in finding 17(f), *269 supra, Ordnance Supply Catalog, dated June 10,1944, identifies tlie ordnance under Ammunition Inspection Code number P5ULA, describes it as “charge, propelling (in case, cartridge, M24), 120-mm gun, Ml”, and provides that the ICC marking required is “Smokeless Powder for Cannon.” However, as indicated in finding 17(g), supra, an illustration identified as “Representative marking of packing boxes for 120-mm gun, Ml ammunition”, contained in the same above-named catalog, shows that the required ICC marking is “AMMUNITION EOR cannon without trojectile.” The February 1951 edition of Department of the Army Supply Catalog under the entry “P5ULA”, also shows the required ICC marking is “ammunition eor cannon without projectiles.” (See finding 17(h), supra.)
Mr. Herczogh’s testimony, based upon extensive experience in hazard classification, is helpful in resolving the conflict in this area. ITe testified, without contradiction, that the designation “Smokeless Powder for Cannon” is only used in connection with shipments of bulk smokeless powder. According to him the designation as “Smokeless Powder For Cannon” was erroneous, and the correct designation is “Ammunition for cannon without projectile”. This conclusion is supported by the record.

Tariff Definitions and Glassification History

26. (a) The phrase “blank cartridges” first appeared in Consolidated Freight Classification (CFC) No. 1, dated in the year 1919, which reads in pertinent part:

Item Articles

12 ammunition, explosive,
* * * * *
14 For Cannon:
$ $ $ $
16 With explosive Projectiles, subject to tariffs of individual carriers.
17 Without Projectiles (Blank Cartridges, metal):
*270 (b) CFC No. 3, effective in the year 1922, contained the following description:

Item, Articles

9 AMMUNITION, EXPLOSIVE,
10 For Cannon:
11 † With empty, sand-loaded or solid Projectiles
(Loaded Cartridges) or without Projectiles (Blank Cartridges, metal):
* * N> * ‡
With explosive Projectiles, subject to tariffs of individual carriers.
CFC No. 3 contains an explanation of abbreviations and symbols used throughout and provides:
In the descriptions of articles * * * the descriptive terms appearing within parentheses constitute another description of the identical article immediately preceding the parentheses.
(c) Supplement No. 4 to CFC No. 5, effective April 30, 1928, contained the same description as CFC No. 3 above, and provided as follows:

*271 (d) CFC No. 6, issued May 1,1930, effective June 15,1930, reads in pertinent part:

(e) Supplement No. 24 to CFC No. 6, issued May 23,1931, effective July 6,1931, contained the following:

*272 (f) CFC No. 14, effective December 31, 1940, contained the following:

Item Articles

1800 ammunition, * * *
:fs # # ‡
1810 Ammunition, fixed, for cannon, witb empty, sand-loaded or solid projectiles, loose or in packages.
1815 Ammunition fixed, noibn, for cannon, loose or in packages.
jji # * # *
1870 Cartridges, cannon, blank, loose or in packages.
(g) Supplement No. 5, effective May 8, 1941, provided:

Item Articles

Δ1800-A ammunition, Explosive, Incendiary, or Gas, Smoke or Tear Producing, * * *
$ $ $ $ $
1810-A Ammunition, fixed, for cannon, with empty, sand-loaded or solid projectile, loose or in packages.
1815-A Ammunition, fixed, noibn, for cannon, loose or in packages.
ift # sfc ¿¡t %
1870-A Cartridges, cannon, blank, loose or in packages.
27. “Ammunition for cannon without projectile” is not listed as such in Consolidated Freight Classification No. 16, issued October 24, 1943, effective December 6, 1943. (See finding 11(f), supra.) However, an examination of the evolution of the term “blank cartridge”, with respect to the classification of commodities for transportation purposes, establishes that it has been the practice of freight classification to consider ammunition for cannon without projectile the same as “Cartridge, cannon blank” — and no significance has been attached to the ordnance meaning of blank am-mnmition.
28. The rates applied by defendant were determined by Mr. Harold G. Pederson, a Transportation Specialist in the Transportation Division of the General Accounting Office. *273 It was Ms opinion that in order to determine tbe proper rate classification, the true identity of the commodity shipped had to be established. In arriving at such a determination, he referred to various ordnance and classification manuals. Starting with the description “Smokeless powder for cannon”, and the Ammunition Code number “P5IILA”, contained in the bills of lading, he determined, by reference to Ordnance Supply Catalog, dated June 10, 1944, that the standard nomenclature for the commodity was “charge, propelling (in case, cartridge M24), 120-mm Ml.” (See finding 17(f), supra.) Noting that there was a conflict in the above-mentioned supply catalog as to the required ICC marking for the commodity (finding 17 (f) and (g)), he also examined Department of the Army Supply Catalog entitled “Ammunition for Antiaircraft Artillery” dated February 1951, (finding 17(h), supra), wherein the ordnance under Code P5TJLA was identified as “CHARGE, propelling, M15, for 120-mm gun”, but the marking required by ICC regulations was “ammunition eor cannon without brojectiles.” On the basis of the foregoing, Mr. Pederson concluded that the latter was the correct marking.
After additional reference to Army TM 9-1901, September 1950, and Joint Army and Air Force Commercial Traffic Bulletin No. 16, entitled “breight classification guide”, dated February 13, 1950, compiled solely for use of transportation officers (see finding 17 (i), supra), and Agent W. S. Topping’s Freight Tariff No. 4, Interstate Commerce Commission Regulations for Transportation of Explosives and Other Dangerous Articles by Freight, (see finding 17(e), supra), Mr. Pederson concluded that freight nomenclature for “Charge, propelling (in Case, cartridge, M24) ” for the 120-mm, Ml, antiaircraft gun was “Cartridge, cannon, blank.” He stated that he considered the ordnance definitions with respect to “blank” and “fixed” ammumtion, but that neither definition affected his determination. While Mr. Pederson admitted lack of experience and knowledge with respect to military weapons or ordnance, which may render any opinion he might offer in that area suspect, it does not render his classification for transportation purposes unreliable.
*274 In reliance on Agent Topping’s Tariff, mentioned above, wherein “Ammunition for cannon with empty projectiles, sand-loaded projectiles, solid projectiles, or without projectiles, * * *” is defined as “fixed ammunition of caliber 37 mm (iy2 inches) and longer, * * *”, (finding 17(e), supra), Mr. Pederson concluded that from a transportation standpoint the commodity in question was also ratable as “fixed” ammunition, where appropriate, with respect to Category 2 and 4 shipments.

Fused Ammunition

29. The defendant has applied a combination rate[7] for those shipments in Categories 2 and 4, by combining the commodity rates as provided by Trans-continental Freight Bureau (TCFB) Tariffs 4 — U and A-V, depending upon the effective dates of each, for “fixed” ammunition for cannon, with the class rate provided in Item 1835 of CFO No. 16. With respect to the Category 2 shipment, the commodity rate provided in TCFB Tariff 4-U was applied from Avondale, Colorado to Everett, Washington. Since there was no through commodity rate beyond Everett, Washington, the class rate as provided in Item 1835 of Consolidated Freight Classification No. 16 was applied from Everett to destination. The same reasoning applied to the Category 4 shipments.
30. The commodity rates provided in TCFB Tariffs 4-U and 4-V were in effect at the time Category 2 and 4 shipments were made, and neither tariff contains an entry for “Cartridges, cannon, blank”. There is, however, an entry for “Ammunition, fixed, for cannon, with empty, sand loaded or solid projectiles or without projectiles” in both of said tariffs. (See finding 11 (d) and (e).) In view of the background of the term fixed, it is concluded that such term is not restricted to a description of ammunition for cannon with projectiles, but also includes ammunition for cannon without projectiles. Thus, for purposes of the commod *275 ity tariffs, the nature of the filler of the projectiles, rather than its classification as “fixed”, is determinative of the applicable rates. The fact that a higher rate (or rates of the individual carrier) is applied to ammunition for cannon with explosive projectiles, with projectiles containing poisonous chemicals, or with projectiles containing non-poisonous chemicals or smohe-producing compounds (see finding 26 (c)), and a lower rate is applied to ammunition for cannon without projectile (see finding 11(f)), is indicative of this distinction. The latter are described in Consolidated Freight Classification No. 16 as “Ammunition, fixed, noibn, for cannon, loose or in packages”. On the basis of the whole record, it is concluded that articles described in the commodity tariffs 4 — U and 4 — V encompass within their meaning ammunition for cannon, without projectiles.
31. The parties have stipulated that if the rates applied by plaintiff for all five categories of shipments (as defined in findings 5 through 9, respectively) are held applicable, plaintiff is due the sum of $15,704.30 from defendant; that if the rates applied by defendant for the first four categories of shipments in dispute are held applicable, the defendant is entitled to recover from plaintiff the sum of $4,857.02, less $1,314.44 due plaintiff for the shipment in Category 5 (finding 9, supra), or a net amount due the defendant of $3,542.58; and that if the rates claimed by either party are held applicable in part and inapplicable as to the remainder, then the exact amount due one party by the other shall be determined pursuant to Rule 47(c) of this court.
Ultimate FINDINGS of Fact
32. The commodity shipped is described in ordnance terminology as “Charge, propelling (in case, cartridge M-24) 120-mm gun”, and described in transportation terminology as “Ammunition for cannon without projectile.”
33. Consolidated Freight Classification No. 16 does not contain a specific entry for “Ammunition for cannon without projectile”, but the entry therein for “Cartridges, cannon, blank * * *” has historically, for purposes of freight classification, been used to identify “Ammunition for cannon without projectile.”
*276 34. The term fixed ammwnition, when applied to the transportation characteristics of the commodity, means that the propelling charge is non-adjustable. Ammunition for cannon (wherein the propelling charge is non-adjustable), with or without projectile, has historically been described for transportation purposes as “fixed ammunition.”
35. The commodity shipped is included within the descriptive nomenclature “Ammunition, fixed, for cannon, with * * * projectiles or without projectiles,” contained in both Trans-continental Freight Bureau Tariffs No. 4-IT and 4-V, as published. (See finding 30, supra.)
36. The Combination Article (see finding 13, supra), is inapplicable since the commodity is classified in Consolidated Freight Classification No. 16.
37. With respect to the shipments involved in Categories 1 and 3, the applicable charge should be computed upon a Class 4 rating published in Item 1835 of Consolidated Freight Classification No. 16 applying to “Cartridges, cannon, blank, * *
38. With respect to the shipments embraced in Category 2, the applicable charges should be computed on a combination of rates over Seattle and Everett, Washington, using as one factor the rates published in Item 1606 of Trans-continental Freight Bureau Tariff 4-U to Seattle and Everett applying to “Ammunition, fixed, for cannon, * * * without projectiles”, and the Class 4 rating named in Item 1835 of Consolidated Freight Classification No. 16 for “Cartridges, cannon, blank, * *
39. With respect to the shipments in Category 4, the applicable charge should be computed by using the Class 4 rating named in Item 1835 of Consolidated Freight Classification No. 16 from origin to Panhandle, Nebraska; from Panhandle to Everett, Washington, the commodity rate published in Item 3200 of Trans-continental Freight Bureau Tariff 4-V; and beyond Everett, the Class 4 rating named in Item 1835 of Consolidated Freight Classification No. 16.
40. On the shipment embraced within Category 5, plaintiff is entitled to recover $1,314.44, as stipulated.
41. On the remaining shipments in all other categories, defendant is entitled to recover $4,857.02 from plaintiff.
*277 Conclusión oe Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the defendant is entitled to recover, under its counterclaim, the amount of $3,542.58, and judgment is entered to that effect. Plaintiff’s petition is dismissed.

 The court finds that “there is no distinction, for the purposes of rate classification, at least on the basis of the above commodity tariffs, between ammunition for cannon with or without projectiles, except that ammunition with explosive projectiles, not being listed, are not subject to commodity rates.”

 See, also, Webster’s New International Dictionary p. 230 (1961 Ed.) which simply defines a “blank cartridge” as “a cartridge having in place of a projectile a wadding (as of paper) sealed in the mouth of the ease.”

 In its answer to plaintiff’s petition herein, defendant denies it issued the bills of lading involved and aUeges that they were prepared by defendant for the convenience of the carrier who issued them under the provisions of 49 U.S.C. 20(11) (1958 ed.). In view of the fact that a stipulation filed by the parties refers to the documents in question as “Government” bills of lading and that the designation thereof is not relevant to the question to be resolved here, they are described as “Government” bills of lading.

 See finding 31, infra, which shows that the parties stipulated the amounts in dispute and due one or the other, depending upon the rates found by the court to be applicable to the several categories of shipments involved in this suit.

 Defendant did not request findings with respect to the applicability of the statute of limitations to any part of plaintiff’s claim nor make any mention of this defense in its brief to the commissioner. Accordingly, it appears that defendant has abandoned its position in regard thereto. In any event, considering the record shows that plaintiff filed suit on July 24, 1962; that defendant made the first deductions from other amounts due plaintiff on July 7, 1959, and the last on November 1, 1961, it is clear plaintiff’s petition was timely because its cause of action accrued on the dates the deductions were made. St. Louis-San Francisco Railway Co. v. United States, 150 Ct. Cl. 610, 619 ; 280 F. 2d 838 (1960).

 These numbers refer to plaintiff’s bill of freight charges submitted to defendant. Various shipments, as identified on the Government bills of lading, are included in each charge and are not to be confused with the bills of lading.

 Pormerly reported as 4.7" Gun, Ml (Antiaircraft).

 This illustration was received in evidence as a part of Defendant’s Exhibit No. 5 (page 40).

 Denotes change not involving reduction or advance.

 Denotes changes in wording which result in neither increases nor reductions in charges.

 A combination through rate applies over a route when there is no single factor rate applying between the point of origin and destination. (See Great Northern Ry. Co. v. United States, supra.) The evidence does not disclose whether such a single factor through rate exists or is applicable in this case. However, plaintiff has not disputed the propriety of the combination and, therefore, it is unnecessary to consider this question.